**SEA HAWK SEAFOODS, INC.; Cook Inlet Processors, Inc.; Sagaya Corp.; William McMurren; Patrick L. McMurren; William W. King; George C. Norris; Hunter Cranz; Richard Feenstra; Wilderness Sailing Safaris; Seafood Sails; Rapid Systems Pacific Ltd., Plaintiffs–Appellees,**

v.

**ALYESKA PIPELINE SERVICE CO.; Exxon Corporation; Exxon Shipping Company, Defendants,**

and

**Joseph Hazelwood, Defendant–Appellant.**

Sea Hawk Seafoods, Inc.; Cook Inlet
Processors, Inc.; Sagaya Corp.; Wil-
liam McMurren; Patrick L. McMur-
ren; William W. King; George C. Nor-
ris; Hunter Cranz; Richard Feenstra;
Wilderness Sailing Safaris; Seafood
Sails; Rapid Systems Pacific Ltd.,
Plaintiffs–Appellees,

v.

Exxon Corporation; Exxon Shipping
Company, Defendants–
Appellants,

and

Alyeska Pipeline Service Company,
Defendant.

In re: The Exxon Valdez,

Sea Hawk Seafoods, Inc.; Cook Inlet
Processors, Inc.; Sagaya Corp.; Wil-
liam McMurren; Patrick L. McMur-
ren; William W. King; George C. Nor-
ris; Hunter Cranz; Richard Feenstra;
Wilderness Sailing Safaris; Seafood
Sails; Rapid Systems Pacific Ltd.,
Plaintiffs–Appellees,

v.

Exxon Corporation; Exxon Shipping
Company, Defendants–
Appellants,

and

Alyeska Pipeline Service Company,
Defendant.

Nos. 98–35796, 98–35807, 98–
36087, and 98–36117.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 3, 1999.

Filed March 16, 2000.

George J. Tsimis (briefed) and Thomas M. Russo (briefed), Chalos & Brown, New York, New York, for defendant-appellant Joseph Hazelwood.

Brian B. O'Neill (argued), Faegre & Benson, Minneapolis, MN, James Springer, Dickstein, Shapiro, Morin & Oshinsky LLP, Washington, DC, David W. Oesting, Stephen M. Rummage, David C. Tarshes, Davis Wright Tremaine LLP, Anchorage, AK, for plaintiffs-appellees Sea Hawk Seafoods, Inc., et al.

Before: BROWNING, WIGGINS,[1] and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge:

This is one of several appeals before this panel relating to the *Exxon Valdez* oil spill litigation. The subject of this appeal is whether the $5 billion punitive damages verdict against Exxon, and the $5,000 punitive damages award against Hazelwood, should be set aside because of irregularities during jury deliberations. We affirm the district court order that it should not. This decision goes only to the motion to vacate the judgment for irregularities during jury deliberations. It does not purport to decide the issue of the amount of damages, compensatory and punitive, awarded to the plaintiffs.

### I. Facts.

This case was tried in three separate phases. The phase with which this appeal is concerned was the punitive damages determination. After the jury awarded $5 billion, defendants filed numerous motions, and appealed from the judgment and from denial of its motion for new trial. While that appeal was pending, newly discovered evidence persuaded the district judge, and

John F. Daum, O'Melveny & Myers, Los Angeles, California, for defendants-appellants Exxon Corporation, et al.

---

1. The Honorable Judge Charles E. Wiggins, who was a member of the panel, died on March 2, 2000. He had concurred in this opinion before his death.

us, that remand was appropriate, under *Crateo, Inc. v. Intermark, Inc.,*[2] for consideration in the trial court. We remanded for consideration of the Rule 60(b)(2) motion for relief from judgment based on the newly discovered evidence. This appeal concerns only the second motion for new trial, based on the newly discovered evidence, not the first motion for new trial, so we do not discuss the facts and legal determinations raised in the earlier motion. Captain Hazelwood, who piloted the *Exxon Valdez* in the accident, appeals, but simply joins in the arguments by Exxon Corporation and Exxon Shipping Company, so we describe the appellants collectively as "Exxon."

A retired police officer from Florida served as a Court Security Officer during the trial and deliberations. He was experienced and much decorated, as a police officer and before that in the military. He acted as one of the bailiffs, maintaining security for the jury room, escorting the jury, attending to its requests for food and other needs, and receiving its communications. The punitive damages phase of the trial took more than four months, so all the participants had considerable contact with each other.

An Anchorage newspaper published a story after the trial describing the extremely stressful summer in the jury room.[3] One of the jurors, Juror A, was especially distressed and was not getting along well with the rest of the jury. That had been obvious to all participants, because she cried in the hall and otherwise acted distressed, and because the jury sent out notes expressing concern about her mental condition. Based on some of the allegations in the article, the district court held an evidentiary hearing in which the jurors were questioned by the judge under oath in open court with counsel present about possible irregularities.

One juror, Juror B, testified that the bailiff motioned him aside as he came to deliberations one morning and "said something about, you know, you guys, you're really having problems with her, or something like that, pulled his gun out, took a bullet out and said maybe if you put her out of her misery or something." Juror B said he might have told the jury foreman about it, but told no one else, and "it really shook me up." Juror B perceived the remark as a tasteless joke rather than as a threat or serious suggestion. The bailiff testified under oath that "I haven't heard anything so absurd in my life. Nothing like that ever came from me." The district judge ruled that "the court is not convinced that the incident ever occurred," but that if it did, it did not warrant a new trial, because Juror A never learned of the communication, and Juror B and the jury foreman did not understand it to be a threat directed at them.

The United States Marshal in Anchorage, John R. Murphy, directed the investigation of the alleged incident. Juror B passed a lie detector examination, and the bailiff's lie detector examination "indicated deception" in the opinion of the polygraph examiner, Investigator Robert Sheldon. Sheldon later confronted the bailiff about aspects of his interrogation that appeared contradictory. The bailiff then admitted that the bullet incident occurred as Juror B described it, but that he "was joking" and that "nothing was meant to be ... a threat or intimidation." Marshal Murphy told the bailiff that because he had lied, the Marshals Service would pursue terminating him unless he resigned. The bailiff turned in a written resignation within five minutes. Marshal Murphy did not tell the district judge or the lawyers that Juror B had been telling the truth and that the bailiff had lied. The bailiff died of a heart attack a few months after being forced to resign, prior to adjudication of the second motion to vacate the judgment. At the time the district court denied Exxon's mo-

**2.** *Crateo, Inc. v. Intermark, Inc.,* 536 F.2d 862, 869 (9th Cir.1976).

**3.** *See The $5 Billion Jury,* Anchorage Daily News, Jan. 22, 1996, at A1.

tion, partly on the basis of believing the bailiff's false testimony, all these events had already transpired, and the Marshal knew the bailiff was lying and that the gun incident had occurred. But the judge did not.

Exxon's lawyers did not know anything about the Marshal's investigation of and report on the bailiff. It was secret. But a lawyer in Fairbanks happened to be representing a woman there in a wrongful termination case in which the bailiff figured, and he had done discovery that disclosed the existence (but not the contents) of the report. He wrote Exxon's lawyers, assuming they knew more than he did, and saying that he had found out in discovery that a supervisor of the bailiff had written in his notes that the report was "potentially explosive" but claimed not to recall why, and the United States Attorney's office objected to disclosing the report or to deposing Marshals Service personnel about it. He hoped to obtain a copy of it from Exxon's lawyers, not realizing that he knew much more about it (such as that it existed) than they did.

After following up on this tip, Exxon filed a second motion for new trial. Though the gun incident described above brought about the motion, Exxon claims that additional incidents also entitle it to relief. In addition to the remark and display of the gun to Juror B, the bailiff had had other contacts with the jurors that Exxon claims entitle it to a new trial. Also, Juror A testified that when she asked the bailiff what would happen if she simply refused to come to the courthouse and deliberate any more, he told her that she could be arrested and put in jail. Also, she testified that one of the other jurors made a remark to her which she understood as a threat to harm her daughters if she did not say that she agreed with the verdict when the jury was polled.

### ANALYSIS

*A. The bailiff's gun remark.*

Exxon argues that the bailiff's remark to Juror B, in the context of other contacts

that it argues were inappropriate for a bailiff, entitles it to have the $5 billion punitive damages verdict vacated and a new trial ordered.

The district judge held extensive evidentiary proceedings, and made extensive findings of fact in support of its denial of the motion for new trial. On the second motion, after the bailiff had been forced to resign for lying, the court found that the incident occurred as Juror B had described it. The district court characterized the bailiff's "maybe if you put her out of her misery" remark as "potentially coercive," but noted that the "potential coercion was not directed at Juror [B]." The juror toward whom the remark might be potentially coercive was Juror A, but she did not know about it during the deliberations and verdict. The juror to whom the remark was made, Juror B, and the jury foreman, to whom Juror B may have repeated it, were not the objects of any coerciveness. The district court expressly found that "Juror [B] was not coerced by the incident and that, with the possible exception of the jury foreman, the other jurors did not learn of the incident during the time they deliberated." Based on these factual findings, the district court concluded that the bailiff's "maybe if you put her out of her misery" remark and display of the gun, though potentially coercive, was not in fact coercive conduct.

The district court therefore treated the bailiff's remark and conduct as an inappropriate *ex parte* contact rather than coercion. The court concluded that "Exxon has not shown prejudice or that the incident between [the bailiff] and Juror B affected the verdict." Based on Exxon's failure to show actual prejudice, the district court concluded that a new trial was not warranted on this ground.

There was testimony that the bailiff had dropped by a Fourth of July picnic the jurors had. Some jurors thought he

should not have been there, though the juror who hosted the picnic apparently invited him. Also, while on a weekend drive in the neighborhood of one of the jurors, Juror C, the bailiff and his wife dropped by the house of Juror C and his wife. Juror C was a gold miner, and lived in a rural area an hour or two out of Anchorage. The two couples had coffee and chatted about guns, but not about anything trial related. The district judge found that the bailiff attended the Fourth of July picnic and had social encounters with Juror C. The court found that these contacts were "not coercive in nature or effect." The district court concluded that because the contacts were not coercive, the burden was on Exxon to show prejudice, and it had not.

█ Our precedents distinguish between introduction of "extraneous evidence" to the jury, and *ex parte* contacts with a juror that do not include the imparting of any information that might bear on the case. Our precedents are mostly in criminal cases, but we have applied the same rules in civil cases.[4] Where extraneous information is imparted, as when papers bearing on the facts get into the jury room without having been admitted as exhibits, or when a juror looks things up in a dictionary or directory, the burden is generally on the party opposing a new trial to demonstrate the absence of prejudice, and a new trial is ordinarily granted if there is a reasonable possibility that the material could have affected the verdict.[5]

█ But this is not an extraneous information case. The bailiff did not tell Juror B anything about the facts or the law. He made a strikingly tasteless joke about Juror A, arising out of her conspicuous emotionality, departure from the jury room, and crying. "Where ex parte contacts are involved, the defendant will receive a new trial only if the court finds 'actual prejudice' to the defendant."[6] This standard applies to *ex parte* contacts when, as compared to extraneous information, they do not pertain to " 'any fact in controversy or any law applicable to the case.' "[7] The contact by the bailiff here was *ex parte* in the same sense the clerk's contact with a crying juror was in *Madrid.* Both cases involve an inappropriate response by court staff to emotion and bickering in the jury room, where the staff contact did not involve any communication bearing on the substantive matters before the jury.[8] The heightened standard for motions for new trial, burden on the movant to show actual prejudice, therefore applies to the bailiff's contact. Our review, where, as here, the district judge has held an evidentiary hearing, is marked by "special deference to the trial judge's impression of the impact of the evidence."[9]

█ While an *ex parte* remark may in some circumstances merit a rebuttable presumption of prejudice because of its inherently coercive effect, as where a judge instructs a juror *ex parte* regarding the verdict,[10] the bailiff's tasteless joke did not merit any such presumption. It did not purport to tell the individual to whom

---

4. *See Rinker v. County of Napa,* 724 F.2d 1352, 1354 (9th Cir.1983) (stating that reliance on criminal cases is appropriate because the "integrity of the jury system is no less to be desired in civil cases." (quoting *United States v. Barfield,* 359 F.2d 120, 124 (5th Cir.1966))).

5. *See United States v. Maree,* 934 F.2d 196, 200–01 (9th Cir.1991); *see also United States v. Madrid,* 842 F.2d 1090, 1093 (9th Cir. 1988).

6. *Maree,* 934 F.2d at 201 (citing *Madrid,* 842 F.2d at 1093).

7. *See id.*

8. *Madrid,* 842 F.2d at 1091.

9. *United States v. Plunk,* 153 F.3d 1011, 1024 (9th Cir.1998).

10. *Cf. United States v. United States Gypsum,* 438 U.S. 422, 462, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978); *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965).

it was directed, Juror B, what his decision in the case ought to be or how he should make it. The bailiff was not telling him he should shoot Juror A, and Juror B did not understand the remark to mean that. The district judge made a finding of fact that "[Juror B] treated this encounter as a bad joke." We defer to this finding of fact as our precedents require.[11]

Exxon argues for application of the standard, more liberal toward grants of new trial, for juror coercion and extrinsic evidence. However, as *Madrid* illustrates, the problem of court personnel making inappropriate remarks to deal with crying jurors who are not getting along with their fellow jurors arises from time to time, and is ordinarily dealt with as an *ex parte* contact case, under the standard requiring the movant to demonstrate actual prejudice.[12]

Exxon has not cited any precedent for applying the extrinsic evidence or coercion standard to an *ex parte* contact case such as this one. These *ex parte* contact cases use a different standard from extrinsic evidence and coercion cases both because *ex parte* contacts are less likely to do any harm to the deliberative process than extrinsic information or coercion, and also because such contacts are very hard to avoid. "[I]t is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."[13] Long trials are especially vulnerable to *ex parte* contacts, because people around the courthouse get to know the jurors, and it becomes much harder for jurors and others to preserve an artificial social isolation as days stretch into weeks. Publicity creates a shower of *ex parte* contacts on the jurors. They become celebrity magnets to aspiring "inside dopesters,"

and also because ordinarily social people are naturally inclined to make small talk about what they heard in the news. Except in large cities, at least some jurors in long trials are reasonably likely to see the judge, witnesses, court personnel, and lawyers at school events, concerts, sporting events, or the grocery store, where social contact is hard to avoid. In a long, high publicity case, a new trial on account of *ex parte* contacts is likely to be no more pure than the first trial. Retrial of a publicized case introduces the additional distortion that jurors in the retrial are likely to have trouble distinguishing what they heard from the publicity after the first trial from what they heard in the courtroom in the second.

■■■ Exxon also argues that the district court, in the course of finding that the "maybe if you put her out of her misery" remark was taken as a "bad joke," violated the rule against inquiring into the effect of a statement during deliberations on a juror's state of mind.[14] The rule does not apply. It is limited to effects on the juror's state of mind "as influencing the juror to assent to or dissent from the verdict,"[15] or "concerning the juror's mental processes in connection therewith."[16] Juror B's testimony was not about his mental processes in connection with the verdict. He was asked what he understood the bailiff's words to mean, that is, whether they were a bad joke or a serious suggestion that he shoot Juror A. That had no bearing at all on whether Exxon should pay punitive damages and how much it should pay. *Rushen* establishes that "[a] juror may testify concerning any mental bias in matters unrelated to the specific issues that the juror was called upon to

---

**11.** *See Valley Eng'rs, Inc. v. Electric Eng'g Co.,* 158 F.3d 1051, 1052 (9th Cir.1998), cert. denied —— U.S. ——, 119 S.Ct. 1455, 143 L.Ed.2d 542 (1999).

**12.** *See Madrid,* 842 F.2d at 1091.

**13.** *Rushen v. Spain,* 464 U.S. 114, 118, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983).

**14.** Fed.R.Evid. Rule 606(b).

**15.** *Id.*

**16.** *Id.*

decide and whether extraneous prejudicial information was improperly brought to the juror's attention," even though the rule prohibits a juror from testifying "about the mental process by which the verdict was arrived."[17] Likewise, in *Madrid* we considered the juror's statement that she "did not think" that the court clerk was trying to influence her verdict, when the clerk found her crying after another juror had sworn at her, and told her she should settle her differences with that juror.[18]

██ The bailiff certainly should not have made his tasteless joke to Juror B. However, after careful review of the extensive evidentiary record and scrutiny of the district court's findings, we conclude that the district court correctly categorized the bailiff's conduct and words as an inappropriate *ex parte* contact with a juror that did not introduce extraneous information into the deliberations and was not, in context, actually coercive. Our precedents therefore require that in order to obtain a new trial on account of it, Exxon would have to demonstrate actual prejudice. It did not.

### B. The bailiff's alleged threats to Juror A

Exxon also argues that it is entitled to a new trial because of newly discovered evidence that the bailiff coerced Juror A. Its theory is that the bailiff threatened both to kill her and also to lock her in jail if she refused to deliberate further. During the extensive evidentiary proceedings on the first motion for new trial, she had made no such allegations. Her emotionally distraught condition had been apparent to the judge and other court personnel, because she ran out of the jury room crying more than once, and her husband had come to court to talk to the judge about how upset she was. But she had not made her accusations of coercion by the bailiff until after the newspaper publicity about denial of the

first motion for new trial. Her husband had testified, during the evidentiary proceedings on the first motion for new trial, that she did not ever tell him that the bailiff or any other court employee had made any communication to her that she considered inappropriate. He testified that she told him the guards outside the jury room tried to "calm her down" and "console her" "with hugs and words." Regarding jail, Juror A's husband testified that his wife felt "penned up" as "everybody does" in a jury, and that "if she chose not to come back, that they would put her in the jail downstairs and bring her up to deliberation during the day," but he did not testify as to who she said told her that. The judge had not required Juror A to testify on the first motion because of her ill health, and Juror A's husband expressed appreciation for that.

When the second motion for a new trial was made, Juror A was required to testify. Her testimony was strikingly different from anything that had been heard before. According to what she said in 1998, three and a half years after the trial, she knew about the bailiff's display of the gun when it happened, because the other jurors told her "[t]hat I was wanted dead." Two of the jurors did not tell her that, but the other nine and also the bailiff "were very creative at telling me how I could be killed." Asked what the bailiff said when he told her he wanted her dead, Juror A gave this response:

[One juror] could have a heart attack; it would be my fault. [The jury foreman] could start smoking and that would be my fault. I could be shot, accidentally, with a throw-away gun on break and wouldn't be able to prove who did it. Or one of the jurors could just accidentally get in the deliberation room with a gun. One day I was very upset and one of my things was just to walk in the little room outside the deliberation room and [the bailiff] told me that he could kill me and

17. *Rushen,* 464 U.S. at 121 n. 5, 104 S.Ct. 453.

18. *See Madrid,* 842 F.2d at 1092.

no one would know ... and the other jurors would back him up.

Asked if the bailiff ever took a bullet out of his gun and showed it to her, Juror A gave this response:

He loaded his gun, yeah.... I don't know anything about guns, and he just had this bullet and he put it in and asked me—I don't remember. Oh, we just—two weeks of terror and I don't know what day it was, but it was something about Russian roulette or something. That's the only time I saw the bullet.

Juror A, during this same line of questioning, gave this description of the threat to put her in jail:

I asked him if I just didn't show up one day what they would do. He said they would arrest me and there was a jail downstairs and I could spend nights in the jail and they would bring me up for deliberation, and it wouldn't solve anything in my life, because home was the only thing that was saving my sanity.

She testified that eight other jurors "most definitely" wanted her dead.

- One, who scared her by "throwing things at me," threatened to rape her, suggesting that rape "would straighten me up." This juror, as the jurors were lined up to reenter the courtroom and deliver their verdict, also made what Juror A took to be a threat against her daughters, discussed in the next section: "he told me that my daughters were very good-looking and to think about that when I gave my vote."

- Another was "big on killing me" by smuggling a knife into the jury room in a cup of ice, and "cutting my body up and flushing it down the toilet."

- Another, who "was slimy, acting like he was on the take," "told me how to commit suicide."

- Another suggested that the first would "make me come to my senses"

through the use of murder or violence.

- Another "had a vacation, that was the most important thing. If it meant killing me, fine. She had a real important vacation."

- There were also various "comments about shooting me."

According to Juror A, once it started, the open discussion of how to kill her came up every day in the jury room.

Juror A testified that she did not tell her husband or anyone else about the death threats from the bailiff and the others at the time. Then she forgot about them, and had no recollection of the bailiff displaying the gun or bullet until her husband told her that the incident with Juror B had been reported in the newspaper. After her husband told her about the story in the newspaper about the display of the gun and bullet to Juror B, then "things started coming back." Juror A kept a personal journal during the trial, but she did not mention the bailiff's threat to kill her or any of the other death threats in the journal. She also talked to numerous journalists, but did not tell any of them about it. She claimed to receive numerous written death threats, but did not save any of them or show any of them to anyone. Juror A subsequently attempted suicide, and was under medical care at the time of her testimony. She attributed her suicide attempt to delivering a verdict that was not her true verdict, because of the threat to her daughters.

Exxon's argument focuses upon the alleged threats by the bailiff, not on the alleged threats by the other jurors, so the restrictions on upsetting a verdict because of what went on in the jury room have no application. There was no objection to the testimony about what went on in the jury room, and it is summarized above because it bears on the credibility determination the district judge made.

The district judge was present when Juror A testified. He had arranged an

informal setting for her testimony, a deposition in a lawyer's office with himself and one lawyer for each side present, instead of testimony in court with all the many lawyers involved, in order to provide her with a less stressful environment. He did not believe that the incidents she described involving the bailiff—the gun display, the Russian roulette comment, the threat to put her in jail—had actually happened. The judge was now well aware that the bailiff could not be assumed to have acted properly. And the bailiff had died of a heart attack shortly after being required to resign, so he could not contradict Juror A's account, which she had not remembered while he was alive.

The district judge nevertheless concluded, applying a preponderance of evidence standard, that the events Juror A now described had not actually occurred. He found that Juror A was telling what she believed to be the truth and not lying, but that what she described as a new memory was actually a false memory stimulated by the newspaper account of the bailiff's contact with Juror B, and mediated through her own high level of emotion:

> [Juror A] more probably than not did not learn of the bullet incident involving [the bailiff] and Juror [B] during the time the jury was deliberating. Rather, the court finds that she learned of this incident later, more probably than not as a result of publicity following the court's denial of Exxon's first motion for a new trial. . . . The court finds that [Juror A] has unintentionally and mistakenly incorporated the incident between [the bailiff] and Juror [B] into her own experience where it formed the basis for erroneous, recently regained memories of other incidents which did not happen.

As a result, the court explicitly found that "[Juror A] did not have any inappropriate, threatening, or coercive encounter with [the bailiff] during jury deliberations," and concluded that Juror A "was not the subject of coercive conduct or other impermissible communications from [the bailiff] . . . during jury deliberations."

The district judge gave extensive reasons for his conclusion. Among them were these:

- He had extensive opportunities, during the trial and deliberations, and during the deposition, to observe Juror A's demeanor, and it showed an emotional condition not consistent with reliability of her report. At the deposition, where she had no personal stake (unlike a litigant in court), and was questioned by a lawyer with a gentle, soft manner, she began trembling the first minute, and within ten minutes "her entire body was trembling" and she was crying, yet unlike most stressed witnesses in court, she had no trouble speaking and "appeared oblivious to the violent trembling of her limbs and copious weeping." There was "no objective reason for [Juror A] to be fearful or emotional," and her "severe trembling and copious weeping was a wholly inappropriate response to the circumstances" and "cast substantial doubt upon the reliability of what she has said."
- Her testimony about the bailiff and also about what the other jurors said and did was "bizarre and shocking."
- According to the other jurors, Juror A had never mentioned being threatened by the bailiff.
- Juror A's husband testified that Juror A had never told him of any communications with "anyone associated with the court" that she deemed to be inappropriate. In fact, Juror A's husband stated that Juror A often received consoling "hugs and words" from the bailiffs immediately outside the jury deliberation room.
- As he personally observed them during deliberations, "other jurors appear to have been concerned for Juror A's emotional well-being" during deliberations.

• Juror A kept a journal during the deliberations, yet "[n]one of the incidents which she now recalls and attributes to [the bailiff] are mentioned in the contemporaneous journal."

The district judge was acutely aware that, the last time he had disbelieved a story about highly inappropriate conduct by the bailiff, he had been mistaken. He said that his own words in his previous finding "have now come back to haunt this judge," and in his order expressly addressed his "own embarrassment over learning that the 'bullet incident' between the [the bailiff] and Juror [B] in fact occurred." But he was not prepared simply to assume that any accusation of any similar incident was true, without careful examination of the evidence, because "[t]hat would be unfair to the plaintiffs and to the ten other jurors."

▪ Exxon argues that the district judge should have believed at least part of what Juror A said the bailiff had done, and part is enough to obtain a new trial. Because the district court held extensive evidentiary hearings and made findings of fact, we review the findings of fact to determine whether they are "clearly erroneous." [19]

▪ Exxon argues that Juror A's testimony "is validated first and foremost by Juror A's attempted suicide." We do not see why. The suicide attempt can just as reasonably be interpreted as an indicator of extreme emotional distress or depression that might distort the individual's ability to perceive and remember social occurrences accurately. Exxon argues that something must have happened to precipitate Juror A's emotional distress during the deliberations. But we know that an entirely innocent, highly stressful event occurred that would cause emotional distress—two weeks of intense jury deliberations in an important case.

Exxon argues that Juror A's "emotional response was proof of the truth of what she was saying." Again, we do not understand why. "Inappropriate affect" is a term any judge has heard many times from psychiatric witnesses testifying to an emotional disorder, such as depression, which would more likely distort an individual's perceptions and memories of social interactions than validate them. Exxon says that "[t]he district court simply did not get it," because the emotions would naturally flow from Juror A's distress about having been threatened with death, but that assumes what is to be proved, that she was in fact threatened with death. Juror A's explanation of why she had not brought up any of the death threats before, "I'd forgotten," would raise serious doubts in any rational finder of fact about whether she had a normally functioning memory.

▪ Exxon argues that the district judge engaged in "judicial psychologizing" that he "was patently unqualified to perform," when he attributed Juror A's testimony to a false memory, because such analysis can only be performed by experts. Exxon cites cases in support of its argument,[20] but they are not on point. They hold that a district court erred in not allowing a defendant to put psychiatric evidence before the jury to show that he suffered from a mental defect that would cause him to make a false confession,[21]

---

**19.** *See U.S. v. Hanley*, 190 F.3d 1017, 1031 (9th Cir.1999) ("We review the district court's denial of a motion for a new trial on the asserted ground of juror misconduct for an abuse of discretion. '[A]lthough we review alleged incidents of juror misconduct independently, we must accord special deference to the trial judge's impression of the impact' of the alleged misconduct. We review the district court's credibility determinations and findings of historical fact for clear error." (internal citations omitted)).

**20.** *United States v. Hall*, 93 F.3d 1337 (7th Cir.1996); *United States v. Shay*, 57 F.3d 126 (1st Cir.1995); *Claar v. Burlington Northern R. Co.*, 29 F.3d 499 (9th Cir.1994); *Franklin v. Shelton*, 250 F.2d 92 (10th Cir.1957).

**21.** *See Hall*, 93 F.3d at 1344–45; *Shay*, 57 F.3d at 133.

that a plaintiff needed some expert witness evidence to show causation between certain physical conditions and claimed chemical exposure,[22] and that a mother bringing a negligence claim was not competent to testify as to her child's internal injuries due to a car accident.[23]

The "judicial psychologizing" argument lacks merit. Any judge or juror assigned the task of deciding whether a juror's account of facts is true must necessarily consider the juror's ability accurately to perceive, remember and relate those facts. Where the judge or juror has good reason to think that the account of the facts is false, yet the witness has no apparent reason to lie, the finder of fact necessarily must think about why the witness might give a false account while attempting to tell the truth. Juror A's account was, as the district judge noted, so unlikely as to be highly implausible. Far from being inappropriate "amateur psychologizing" as Exxon contends, the district judge's careful analysis focused on factors that juries are routinely instructed to consider: "the witness' memory"; "the witness' manner while testifying"; "whether other evidence contradicted the witness' testimony"; "the reasonableness of the witness' testimony in light of all the evidence"; and "any other factors that bear on believability." [24]

▇▇▇ Exxon argues that we must reverse because the district judge did not explicitly and separately discuss Juror A's allegation that the bailiff threatened her with jail if she refused to come to court and deliberate. This part of her account did not suffer from the implausibility of the rest of it, because courthouses ordinarily have holding cells for prisoners, and it may be that there are circumstances where a recalcitrant juror could be

brought in and held pursuant to a bench warrant.[25] But the district judge did not have this allegation in isolation. Juror A testified that the bailiff made this threat in the conversation where he threatened to kill her, and testified to it in the series of answers where she described all the lurid ways she could be killed.

It is logical to disbelieve even a plausible allegation if a witness makes it in the course of a generally implausible account. Suppose, hypothetically, a person says "I saw a woman milking a cow." That is plausible. Now suppose the person goes on to say "and the woman and cow were inside a horse's head, and there was another woman who was walking upside down on the roof of an upside down house." In light of these additional statements, it is not sensible to say, as Exxon's argument implies, "well, she must have seen something, and a woman milking a cow is plausible, so she must have at least seen a woman milking a cow." It is far more probable that the person is not describing anything that happened in the empirical actuality of which findings of fact are made, and instead saw all this in a Marc Chagall painting (or if the hypothetical speaker is Marc Chagall, in his imagination). Juror A was not describing a Chagall painting, but she described events so unlikely, with a demeanor so extreme, that a finder of fact could reasonably conclude that she suffered from a condition that would distort her perceptions or recollections. The district judge so concluded. If a person claims to have perceived things which almost certainly did not occur, then it is reasonable to disbelieve the person's claim to have perceived things that might otherwise reasonably be thought to have occurred. The district judge did not accept the truth of anything Juror A said,

---

22.  *See Claar,* 29 F.3d at 504.

23.  *See Franklin,* 250 F.2d at 97.

24.  Ninth Circuit Manual of Model Jury Instructions, Civil, Form 3.7 (1997).

25.  *See generally* 28 U.S.C. § 1866(g) (1994) (providing that juror who fails to appear pursuant to summons for jury duty and fails to show cause for failing to appear "may be fined not more than $100 *or imprisoned not more than three days,* or both." (emphasis added)).

because of the extreme unlikelihood of much of what she said, as well as her demeanor while saying it. We routinely instruct jurors that they "may believe everything a witness says, or part of it, or none if it,"[26] and a judge has the same choices, for the same reasons. The district judge rejected all of Juror A's testimony, including her account of the bailiff's threat to put her in jail if she refused to come to court and deliberate. His finding was not clearly erroneous.

Exxon also argues that the district court's instructions did not adequately emphasize each juror's duty to maintain her own honest convictions rather than yield them to reach a verdict, and each juror's duty to maintain courtesy toward the other jurors. This argument could be and was made only in Exxon's first motion for new trial, not the second motion for new trial, the denial of which is the only issue before us. The second motion is based on "newly discovered evidence" under Rule 60(b)(2).[27] The judge's instructions to the jury were of course not "newly discovered evidence" years after the trial had concluded. They are therefore not before us for review. We do not intimate that the judge's instructions fell outside the discretion the district court had to formulate instructions.[28]

■■■ Exxon argues that Juror A's account of the bailiff's alleged threat to put her in jail and bring her upstairs for deliberations was corroborated by her husband's testimony. It would not be decisive if it was, but in fact it was not. What he said was that his wife felt "penned up," as jurors typically do during lengthy deliberations. He also said that "her impression" was that "if she chose not to come back, they could put her in the jail downstairs and bring her up to deliberation during the day." He did not testify that she said the

bailiff had told her this. The impression could as easily have come from a juror or some other acquaintance who had been on a state jury where the same question was raised, and an answer along those lines had been given. Jurors sometimes learn a lot from accounts by others of jury service in other cases.

In sum, the district judge described the focus of his findings as being on whether Juror A had been "threatened" or "intimidated" by the bailiff. That included the alleged threat to hold her in jail if she refused to show up. He held extensive evidentiary hearings, made careful findings of fact, and found that Juror A's account, in its entirety, did not merit belief, despite its subjective honesty. These findings were not clearly erroneous.

## C.  Juror C's Alleged Threat

■■■ Exxon argues that the district judge was required to grant a new trial because of a threat after the jurors had reached their verdict but before they returned it in open court. When the jurors have a verdict, they typically tell the bailiff. After the judge causes the parties, counsel and others to assemble in court, the bailiff informs the jurors, and they line up awaiting his signal to walk into the courtroom. Once in court, their verdict is handed to the bailiff or deputy clerk, who passes it to the judge to inspect for defects of form, such as illegibility or not being signed by the foreman. Assuming that there are no defects of form, the judge has the deputy clerk read the verdict out loud. Many judges, with or without a request by counsel, then have the clerk poll the jury. That means that the deputy clerk asks each of them in open court whether the verdict as read is that juror's true and correct verdict. Only after each jurors

---

26.  Ninth Circuit Manual of Model Jury Instructions, Civil, 3.7 (West 1997).

27.  Fed. R. Civ. Pro. Rule 60(b).

28.  See Gilbrook v. City of Westminster, 177 F.3d 839, 860 (9th Cir.1999) ("Because the district court has substantial latitude in tailoring jury instructions, we review the formulation of those instructions for an abuse of discretion.").

says that it is, does the judge accept the verdict and direct that it be entered.[29]

If a juror says "no" during the polling in open court, then the verdict is not entered. There may be a motion for mistrial, and the judge may decide whether to discharge the jury and declare a mistrial, or order the jury to deliberate further.[30] Juror A testified that she planned to say "no" when the jury was polled, because she recognized that as a moment when a juror enjoys a high degree of physical safety. But she was scared to do so because as the jurors lined up to enter the courtroom, Juror C "told me that my daughters were very good-looking and to think about that when I gave my vote." She understood that remark to be a threat directed at her daughters.

Exxon argues that the rule against allowing a juror to impeach her own verdict[31] does not apply because the alleged remark was made after the jurors had concluded their deliberations. We need not determine whether its legal argument has any merit, a doubtful proposition,[32] because the district judge made a finding of fact, as discussed above, that Juror A's account was not worthy of belief. This finding was not clearly erroneous, so the alleged threat must be treated as imaginary.

## CONCLUSION

The district court's denial of Exxon's Rule 60(b)(2) motion based on irregularities in jury deliberations is AFFIRMED.

---

**29.** *See* 1 Kevin F. O'Malley et. al, *Federal Jury Practice and Instructions,* § 9.07 (5th ed.2000).

**30.** *See id.*

**31.** Fed.R.Evid. Rule 606(b).

**32.** *See Traver v. Meshriy,* 627 F.2d 934, 941 (9th Cir.1980).