**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**David Francis MARCUCCI,
Defendant–Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**Christopher Leyva–Garcia,
Defendant–Appellant.**

**United States of America,
Plaintiff–Appellee,**

v.

**David Gamboa–Aristegui, Defendant–
Appellant.**

**Nos. 01–50468, 01–50524, 01–50547.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 5, 2002.

Filed Aug. 16, 2002.

---

Steven F. Hubachek (argued), Office of
the Federal Defenders, and David J. Zug-
man, San Diego, CA, for the defendant-
appellant.

**1158**

Patrick K. O'Toole, United States Attorney, Richard C. Cheng, Assistant United States Attorney, on the Marcucci brief, MiYung Park, Assistant United States Attorney, on the Gamboa–Aristegui brief, Pennie M. Carlos, Assistant United States Attorney, on the Leyva–Garcia brief and argued all cases, United States Attorney's Office, San Diego, CA, for the plaintiff-appellee.

Before BOOCHEVER and HAWKINS, Circuit Judges, and WEINER,* District Judge.

## OPINION

PER CURIAM:

Because these cases present the major issue in common, we consolidate them for disposition. The appellants collectively claim that their indictments should have been dismissed because the district court's charge to the grand jury misstated its constitutional role and function. Separately, they raise issues concerning *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and prosecutorial misconduct. We affirm the convictions for the reasons set out below.

## FACTS AND PROCEEDINGS BELOW

In 2001, Christopher Leyva–Garcia ("Leyva") conditionally pled guilty to an indictment charging him with possessing and importing just under fifty kilograms of

marijuana. His plea permitted appeal on two issues: the grand jury issue identified above, and an *Apprendi* claim that the statute under which he was charged was facially unconstitutional, or at least, requires reconstruction such that the government must show mens rea as to drug type and quantity.

In an unrelated incident in the spring of 2001, David Gamboa–Aristegui ("Gamboa") also conditionally pled guilty to an indictment charging him with importing and possessing over 22 kilograms of marijuana, preserving for appeal the grand jury issue and an *Apprendi* issue similar to that presented by Leyva's appeal.

Finally, David Francis Marcucci ("Marcucci") was convicted by a jury in 2001 on a charge of attempted bank robbery. On appeal, Marcucci alleges the same grand jury violation as Leyva and Gamboa; he also contends the prosecutor made inflammatory comments in his closing argument. Marcucci's grand jury argument stands in a slightly different posture from that of Leyva and Gamboa because he initially was denied the transcript of the charge given to the grand jury. However, the government has conceded that the grand jury charge in Marcucci's case was essentially the same as those given in the proceedings affecting the other appellants.

## STANDARD OF REVIEW

■■■ The denial of a motion to dismiss the indictment is reviewed de novo. *United States v. Haynes*, 216 F.3d 789, 796 (9th Cir.2000). A challenge to the constitutionality of a statute is reviewed de novo. *United States v. Serang*, 156 F.3d 910, 913 (9th Cir.1998). When an objection occurs, a prosecutor's allegedly improper closing argument is reviewed under the harmless error standard: the court's task is to determine whether error occurred, and if so, whether it was harmless. *United States v. Laurins*, 857 F.2d 529, 539 (9th Cir.1988).

---

* Honorable Charles R. Weiner, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

## THE CONSTITUTIONALITY OF THE GRAND JURY CHARGE

Gamboa, Leyva and Marcucci (collectively, "appellants") argue that the district court should have granted their motions to dismiss their indictments, because the charge to the grand jurors in their cases improperly described the grand jury's constitutional role and functions, thus depriving appellants of their right to a grand jury's independent exercise of its discretion. Their specific complaint is that the charge did not tell the grand jury that it could refuse to indict them even if there was probable cause to support an indictment.

In each case, the district court gave almost verbatim the model charge that the Administrative Office of the United States Court recommends be given to new grand juries at the beginning of their service,[1] which includes the following passages:

[I]t is important that you listen very carefully to these instructions at this time ... I think they'll outline for you what your responsibilities are, and they will be of great assistance to you in discharging your duties.

The purpose of the Grand Jury is to determine whether there is sufficient evidence to justify a formal accusation against a person.

[Y]our task is to determine whether the government's evidence as presented to you is sufficient to cause you to conclude that there is probable cause to believe that the accused is guilty of the offense charged. To put it another way, you should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably guilty of the offense with which the accused is charged.

You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal. That is to be determined by Congress and not by you. Furthermore, when deciding whether or not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment.

If past experience is any indication of what to expect in the future, then you can expect candor, honesty and good faith in matters presented by the government attorneys.[2]

### The Propriety of the Charge

■ Appellants claim the model charge is unconstitutional because it does not explain to the grand jurors that they can refuse to indict even if they find probable cause. Whether this standard charge is constitutional is a matter of first impression in this or any other circuit.

We note initially that the language of the standard grand jury charge does not state that the jury "shall" or "must" indict, but merely that it "should" indict, in the event that it finds probable cause. The language does not eliminate discretion on the part of the grand jurors. The appellants acknowledge that, but insist the charge must do more, and must specifically tell the grand jury that it has no obligation to charge if it finds probable cause.

The grand jury clause of the Fifth Amendment states "No person shall be held to answer for a capital, or otherwise

---

1. *See* 1 Sara Sun Beale et al., GRAND JURY LAW AND PRACTICE § 4:5 (2d ed.2001).

2. Before Gamboa's and Leyva's grand jury, the two Assistant U.S. Attorneys working with the grand jury were later introduced as "two wonderful public servants [who] are here to assist you in the discharge of your duties." This praise was not mentioned before Marcucci's grand jury panel.

infamous crime, unless on a presentment or indictment of a Grand Jury." [3] The Constitution contains no language requiring the grand jury to be told that it can refuse to indict if probable cause is found. Appellants' argument that such language is constitutionally required rests on inapplicable statements in a Supreme Court case and on appellants' mistaken construction of the history of the grand jury.

In *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986), a black defendant convicted of first-degree murder filed a petition for habeas corpus, raising an equal protection challenge to the California grand jury that indicted him, because blacks were excluded from the grand jury. Citing "a doctrine of equal protection jurisprudence first announced in 1880 ... requiring reversal of the conviction of any defendant indicted by a grand jury from which members of his own race were systematically excluded," *id.* at 255, 106 S.Ct. 617, the Court affirmed the district court's reversal of the defendant's conviction, noting "the need for such a rule is as compelling today as it was at its inception." *Id.* at 266, 106 S.Ct. 617. In the course of following its longstanding precedent that racial "discrimination in the grand jury undermines the structural integrity of the criminal tribunal itself, and is not amenable to harmless-error review," the Court explained:

> even if a grand jury's determination of probable cause is confirmed in hindsight by a conviction on the indicted offense, that confirmation in no way suggests that the [racial] discrimination did not impermissibly infect the framing of the indictment and, consequently, the nature

or very existence of the proceedings to come.

> When constitutional error calls into question the objectivity of those charged with bringing a defendant to judgment, a reviewing court can neither indulge a presumption of regularity nor evaluate the resulting harm.

*Id.* at 263–64, 106 S.Ct. 617.

*Vasquez* establishes that racial discrimination in the selection of a grand jury is a "systematic flaw in the charging process," *id.* at 264, 106 S.Ct. 617, a flaw that undermines the court's confidence in the objectivity—the essential fairness—of the grand jury, even where a subsequent conviction is ample evidence of probable cause. Appellants seek to establish another "systematic flaw in the charging process" justifying automatic reversal: the failure to charge the grand jury that it has the power to refuse to indict when probable cause exists.

Appellants base their argument on the following language in *Vasquez* about the function of the grand jury:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense—all on the basis of the same facts. Moreover, "*[t]he grand jury is not bound to indict in every case where a conviction can be obtained.*" *United States v. Ciambrone,*

---

**3.** The full text of the relevant portion of the Fifth Amendment is: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the

Militia, when in actual service in time of War or public danger ...." U.S. CONST. amend. V. "Infamous" crimes refers to at least all felonies. *Cf. Stirone v. United States,* 361 U.S. 212, 215, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

601 F.2d 616, 629 (2d Cir.1979) (Friendly, J., dissenting).

*Id.* at 263, 106 S.Ct. 617 (emphasis added).

This language—dictum quoting a dissent in a Second Circuit case—does not establish a constitutional right to have the grand jury charge include a statement that although the grand jury's function is to determine whether probable cause exists, it nevertheless has unlimited discretion to decide whether to indict even when it finds probable cause.[4] Instead, the quotation from *Vasquez* describes powers that grand juries have exercised at certain times in history—powers that are not eliminated by the grand jury charge that appellants challenge, with its statement that the grand jury "should" indict if it finds probable cause.

The grand jury was intended to shield individuals against unfounded accusations:

> Historically, [the grand jury] has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will.

*Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). The Supreme Court has repeatedly emphasized that the grand jury protects the individual by requiring probable cause to indict. *See United States v. Williams,* 504 U.S. 36, 47, 51, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) ("[T]he whole theory of [the grand jury's] function is that it ... serve[s] as a kind of buffer or referee between the government and the people .... to assess whether there is adequate basis for bringing a criminal charge."); *United States v. Dionisio,* 410 U.S. 1, 16–17, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973) (grand jury's "mission is to clear the innocent, no less than to bring to trial those who may be guilty"); *Branzburg v. Hayes,* 408 U.S. 665, 686–87, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ("[t]he ancient role of the grand jury ... has the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions.").

The grand jury originated in England, where it replaced the earlier practice of bringing of criminal charges by private

4. None of the additional cases cited by the dissent presented the issue of the grand jury's power to refuse to indict even where probable cause exists. The quoted portions of those cases are weak support for appellants' argument. The quotation from *Gaither v. United States,* 413 F.2d 1061, 1066 n. 6 (D.C.Cir. 1969), quotes language from a long-superseded 1968 version of *Moore's Federal Practice,* the current version of which makes no explicit reference to any power to refuse to indict. *See* 24 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 606.02[1] (3d ed. 2002) ("Still, the grand jury can reflect the conscience of the community in providing relief when strict application of the law would prove unduly harsh."). The dissent also quotes a *concurrence* in *United States v. Cox,* 342 F.2d 167, 189–90 (5th Cir.1965), which has no force even as Fifth Circuit precedent. The majority opinion in *Cox* held that a federal prosecutor could not be compelled to sign a Mississippi grand jury's indictment for perjury against two black men in a voting rights case during the struggle for civil rights. Like *Vasquez, Cox* contained an inference of racial discrimination by the grand jury, "[t]he only example the Court gave where such a presumption [of fundamental unfairness in the grand jury proceeding] would exist." 24 MOORE'S FEDERAL PRACTICE § 606.05[1].

Finally, none of the cases cited above deals with the charge to the grand jury. There is no indication, and the dissent does not claim, that any charge, standard or otherwise, has ever informed the grand jury that it is free not to indict even if probable cause exists.

complaint, by calling together sixteen men to decide who should be charged. Accusations were not brought to the grand jury *by a prosecutor*; the jurors themselves brought with them names of those suspected of violating the law. *See* Andrew D. Leipold, *Why Grand Juries Do Not (And Cannot) Protect the Accused*, 80 COR-NELL L. REV. 260, 280–81 (1995). English grand juries in 1681 refused to issue treason indictments despite great pressure from the king, although a reconstituted grand jury later returned the indictments sought by the Crown. *Id.* at 282. When the grand jury system came to America with the colonists, it thus carried at least some reputation for independence, a reputation it seemed to confirm when grand juries refused to indict John Peter Zenger, a newspaper publisher, for libel; although Zenger was eventually prosecuted by government information, he was found not guilty. *Id.* at 284.

Before independence, the grand jury at times stood between the colonies and the Crown by refusing to indict colonists for what the jury considered oppressive rules, such as the tax laws. *Id.* at 285. The incorporation of the Grand Jury clause into the Fifth Amendment occurred after little debate, and the grand jury did not show significant independence until the years before the Civil War, when Southern grand juries were quick, and Northern juries slow, to indict for crimes related to the abolition of slavery. *Id.* at 285–86. In almost every case in which a grand jury seemed to show independence by refusing to indict, however, the defendant was eventually indicted by a different grand jury, and in most cases the refusal to indict was based on local political reasons. *Id.* at 287.

The early examples of grand jury independence have not been echoed in present times. Commentators are unanimous that "in modern times the grand jury has lost much of its independent force." 24 MOORE'S FEDERAL PRACTICE § 606.02[1]; *see, e.g.,* Wright and Miller, FEDERAL PRACTICE AND PROCEDURE (2002) § 101, at 298 ("it is ... a mistake to overstate the extent to which a grand jury is independent" from court and prosecutor); Susan W. Brenner, *The Voice of the Community: A Case for Grand Jury Independence*, 3 VA. J. SOC. POL'Y & LAW 67 (1995) (documenting diminishment of grand jury's investigative powers and arguing Supreme Court should declare procedures open to expose the lack of independence); Roger Roots, *If It's Not A Runaway, It's Not a Real Grand Jury*, 33 CREIGHTON L. REV. 821 (2000) (grand juries rarely challenge federal prosecutors and "there is no such thing as modern grand jury independence" since Federal Rules of Criminal Procedure were enacted in 1946). The lost independence includes the erosion of the grand jury's early investigative powers, its inability to make its own presentments, and the limited nature of the grand jury's inquiry.[5] This lack of autonomy is not due to the charge to the grand jury, and would not be cured by a change in the language.

The history of independence of the grand jury as an indicting body is mixed. Refusals to indict have almost always been as much political as principled. While we may want the grand jury to refuse to

---

5. The Supreme Court has, over time, determined the kind or amount of information required to be disclosed to grand jurors. *See, e.g., Williams*, 504 U.S. at 54–55, 112 S.Ct. 1735 (grand jury need not be presented with exculpatory evidence); *Costello v. United States*, 350 U.S. 359, 363–64, 76 S.Ct. 406, 100 L.Ed. 397 (1956) (hearsay evidence may be sufficient basis for indictment); *United States v. Calandra*, 414 U.S. 338, 349–52, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (grand jury can hear evidence obtained in violation of exclusionary rule).

indict when an oppressive government is unfairly targeting an individual, or when the laws being enforced are clearly (at least in retrospect) unjust, grand juries lose any guarantee of fairness if they have unfettered discretion to decide whether clear evidence of probable cause should be disregarded in each individual case. Grand juries may have any number of motivations not to issue an indictment when there is probable cause, other than the protection of the individual from an overweening government. It would be impossible to tell whether the motivation not to indict was, for example, based on local politics, racial or other discrimination, or anti-government sentiment, because grand juries operate in secret, and a decision not to indict is almost never reviewable. *See Gaither*, 413 F.2d at 1066; Leipold, 80 CORNELL L. REV. at 309–10.

Neither the appellants nor the dissent proposes specific language to replace the current charge. This failure is understandable, because any alternate language is fraught with problems. If, as the dissent first suggests, the grand jury were charged consistent with *Vasquez,* presumably with the dictum that "the grand jury is not bound to indict in every case where a conviction can be obtained," that raises far more questions than it answers. Any grand jurors listening to the charge would wonder what that means; they have just been told to find probable cause before indicting, and they are then told that they do not have to indict if they find probable cause, without any further guidance. The dissent's second suggestion is that the ju-

rors be told that they must find probable cause before indicting. That is, essentially, what the current charge does. The third suggestion is that the jurors be told that they must find probable cause, but it is not the only consideration. What are the additional considerations? The dissent is silent. The difficulty in finding alternative language that does not do considerable mischief is a sign of the impracticality of giving the grand jury a charge that it has the discretion to decide, willy-nilly, whether or not to indict when there is ample probable cause.[6]

Further, the immediate fallout of declaring the charge unconstitutional would be sweeping. Every indictment issued by a federal grand jury given the standard charge would violate the Constitution. The dissent's conclusion that the charge is structural error would require us to reverse *every* conviction in an active case reached on any indictment by a grand jury given the standard charge, dismiss the indictments, and require reindictments. This would likely apply to every criminal conviction in this circuit, as we have no indication that the standard charge generally has not been given to federal grand juries here (or across the nation).

▪ That extreme result is unnecessary. The current charge to the grand jury informed the grand jurors that they were not merely an arm of the government, but rather an independent body.[7] For instance, the grand jurors were told that:

---

6. The dissent hypothesizes that in these cases the grand jury might have refused to indict the appellants because Leyva was young, the drug in Leyva's and Gamboa's cases was only marijuana, and Marcucci was a bungling bank robber. First, because the transcripts are secret, there is no way to tell whether the grand jury knew of Leyva's age or Marcucci's ineptness. Second, these factors should not

be taken into account in a decision to indict, but at sentencing if the Sentencing Guidelines allow.

7. Appellants also complain that the charge impermissibly favors the government. In light of the charge's emphasis on the independence of the grand jury, however, the charge does not unfairly tilt the balance.

As members of the Grand Jury, you in a very real sense stand between the government and the accused. It is your duty to see to it that indictments are returned only against those whom you find probable cause to believe are guilty and to see to it that the innocent are not compelled to go to trial.

It is extremely important for you to realize that under the United States Constitution, the Grand Jury is independent of the United States Attorney and is not the arm or agent of ... any governmental agency charged with prosecuting a crime ... you must depend on your own independent judgment, never becoming an arm of the United States Attorney's Office. If the facts suggest that you should not indict, then you should not do so even in the face of the opposition or statements of the United States Attorney.

The charge, by telling the jury that it "should" rather than "shall" or "must" indict if it finds probable cause, leaves room—albeit limited room—for a grand jury to reject an indictment that, although supported by probable cause, is based on governmental passion, prejudice, or injustice. The difference between "should" and "shall" is not, as the dissent suggests, a lawyer's distinction, but a commonplace understanding; "shall" is used to "express what is mandatory," "should" to express "what is probable or expected." *Webster's Third Int'l Dictionary* 2085, 2104 (1986). If a grand jury were to refuse to indict a defendant under those extreme circumstances of governmental overreaching, the charge to the grand jury would not be violated.

Meanwhile, this charge to the grand jury is consistent with the historical function of the grand jury—protecting citizens from unfounded accusations not supported by probable cause. As the Supreme Court recently stated, "the Fifth Amendment grand jury right serves a vital function in providing for a body of citizens that acts as a check on prosecutorial power." *United States v. Cotton*, —— U.S. ——, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002) (citing 3 STORY, COMMENTARIES ON THE CONSTITUTION § 1779 (1883), *reprinted in* 5 THE FOUNDERS' CONSTITUTION 295 (P. Kurland & R. Lerner eds. 1987)). Story described the grand jury's function:

> [A]n indictment is usually in the first instance framed by the officers of the government, and laid before the grand jury. When the grand jury have heard the evidence, if they are of opinion, that the indictment is groundless, or not supported by evidence, they used formerly to endorse on the back of the bill, "ignoramus" or we know nothing of it, whence the bill was said to be *ignored.* But now they assert in plain English, "not a true bill," or which is a better way, "not found;" and then the party is entitled to be discharged, if in custody, without further answer. But a fresh bill may be preferred against him by another grand jury. If the grand jury are satisfied of the truth of the accusation, then they write on the back of the bill, "a true bill," (or anciently, *"billa vera."*) The bill is then said to be found, and is publicly returned into court; the party stands indicted, and may then be required to answer the matters charged against him.
>
> From this summary statement it is obvious, that the grand jury perform most important public functions; and are a great security to the citizens against vindictive prosecutions, either by the government, or by political partisans, or by private enemies.

We conclude that the charge to the grand jury was not unconstitutional. Because there was no error in the charge, it is unnecessary to inquire further into wheth-

er the charge constituted structural or harmless error.

## APPRENDI ISSUES IN GAMBOA AND LEYVA

■ Gamboa and Leyva argue that the drug statutes [8] under which they were convicted were facially unconstitutional after *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We have squarely rejected that argument. *See United States v. Mendoza–Paz,* 286 F.3d 1104, 1110 (9th Cir.2002) (21 U.S.C. § 960); *United States v. Varela–Rivera,* 279 F.3d 1174, 1175 n. 1 (9th Cir.2002) (21 U.S.C. § 1952). They also argue in the alternative that Apprendi would require a showing of mens rea as to drug type and quantity. We have rejected that argument as well. *See United States v. Carranza,* 289 F.3d 634, 644 (9th Cir.2002).

## PROSECUTORIAL COMMENT IN MARCUCCI

Because Marcucci's counsel objected to the prosecutor's closing argument, we review to determine whether there was error, and if such error existed, whether it was harmless.

■ In order to evaluate whether any impropriety occurred in the prosecutor's comments at close, it is worth considering first how Marcucci's lawyer painted his client as too much the naif to be someone who would try to accomplish a bank robbery through intimidation. At closing, the defense argued to the jury:

> To look at him and to judge him as other bank robbers is insulting to other bank robbers. I mean, this is the man that you're going to categorize with your John Dillingers of the world? This is our sophisticate? This is· the person

we're worried about? Because if there is something in your mind going, you know what, this isn't what I thought of when I thought of a bank robbery, this isn't what I was expecting when I had to go to federal court, well, then your thought, that little seed in your mind is telling you the truth, which is this is not a bank robber. He did something stupid. And yeah, he would have taken the money. But was he willing to use force and violence? They are not charging him with stealing. They are not charging him with going in the bank and trying to get money that didn't belong to him. They are saying that he did it with force and violence, and that's a radically different thing. He was incapable of getting the money by force and violence—incapable. And the teller knew it. And that's why she said, you know, I need approval.

To this "Marcucci does not look like a bank robber" argument, the prosecutor responded in closing by saying that just because someone doesn't look like a threat does not mean that he is not a criminal. The prosecutor addressed the jury:

> [W]hen you came in here, I suppose you had a pre-conceived notion as to how people should look, how they should behave. When you thought of a person that was shooting up a school, when you thought[of a person] that was bombing a federal building,[9] did you have the pre-conceived notion as to what that person would look like? Sure. Everyone wants to have that. You want to have a person that makes it convenient to comply with this thought, that that person has to be the most evil looking of persons, with horns, with tails, with swastika tattoos, with little teardrops in their eyes, with

8. Leyva and Gamboa were each convicted on one count of importation of marijuana under 21 U.S.C. §§ 952 and 960.

9. At this point, counsel for Marcucci objected twice and was overruled by the district court. The quotation above omits the interruption of the objection and overruling.

slicked back hair, with knuckle braces and guns and weapons blazing.... Ladies and gentlemen, those people are not all criminals, as well as those people that are criminals that commit bank robberies, that commit attempted bank robberies, are not always obvious to see.

Marcucci argues that the prosecutor committed misconduct by "comparing Mr. Marcucci to mass murderers and other infamous characters." But, as is evident from the excerpt above, at no time did the prosecutor compare Mr. Marcucci to "school shooters and terrorists." Rather, the prosecutor pointed out that people have preconceived notions of what criminals look like and don't look like, and that these notions need to be and are challenged by the realities of the wide cosmetic array of criminals.

 Further, the prosecutor's "you can't judge a book by its cover" argument falls squarely within the protected "invited reply" rule. *See United States v. Young,* 470 U.S. 1, 12–13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). While it is true that invited reply does not give a prosecutor carte blanche to engage in improper tactics, *see United States v. Sarkisian,* 197 F.3d 966, 990 (9th Cir.1999), this qualification does not apply to these facts. Notwithstanding Marcucci's protestations that the prosecutor's comments were "highly inflammatory and prejudicial," there is little evidentiary or legal support for such a finding.

We find no evidence of prosecutorial misconduct here, and so we need not address whether such error was harmless.

## CONCLUSION

The district court's judgment is **AFFIRMED.**

MICHAEL DALY HAWKINS, Circuit Judge, Dissenting:

When Congressman James Madison sat down to write out a series of proposed amendments to the freshly-adopted Constitution, he was painfully aware of the ratification process in which the absence of a Bill of Rights had provoked such strident opposition. Fresh in the minds of the former colonists was their treatment at the hands of the British Crown and those colonial institutions that protected them from what they saw as the arrogant exercise of executive authority. Opponents of the proposed constitution wanted assurances that what they viewed as the best of those protections would continue in the new government.[1] On any short list of those protective devices would have been the grand jury. When King George III's colonial appointees sought sedition charges against John Peter Zenger for his editorials critical of the Crown and when participants in the Boston Tea Party faced criminal charges, what stood between them and the dock was a grand jury made up of a group of their fellow citizens free to refuse a prosecutor's entreaties or a king's demands.[2]

---

1. *See* Drew R. McCoy, *The Last of the Fathers: James Madison & the Republican Legacy* 89 (1989) ("He never forgot his daunting experience at the 1788 convention in Richmond; the Federalists' razor-thin margin of victory there had reflected the strength, among many delegates whom Madison greatly respected, of the fear that excessive power would accrue to the general government.").

2. *See* Leroy D. Clark, *The Grand Jury: The Use and Abuse of Political Power* 18 (1975). For other historical examples, *see generally*

Marvin E. Frankel & Gary Naftalis, *The Grand Jury: An Institution on Trial* 9 (1977). To be sure, our historical experience also includes instances where the grand jury has acted to protect insiders against outsiders, and majorities against minorities. The grand jury has also been criticized for serving as a modern-day Star Chamber. *See generally* Michael E. Deutsch, *The Improper Use of the Federal Grand Jury: An Instrument for the Internment of Political Activists,* 75 J.Crim. L. & Criminology 1159, 1179–83 (1984); David J. Fine, Comment, *Federal Grand Jury Investi-*

The grand jury requirement now lives in the Fifth Amendment. It says that no serious (felony) federal charges may be brought against someone without the approval of a group of citizens, drawn at large from the community, who are entirely free to charge what the government proposes, to charge differently, or to not charge at all. Operating in secret and answerable to no one for its decisions, the grand jury is a truly unique institution. And while subject to the supervision of the judicial branch, it is part of no single branch of government.[3] Two hundred fifteen years have brought about some considerable changes in the grand jury. Its use as an investigative tool is more common now, as is criticism for its potential for abuse.

But regardless of its apparent virtues and vices, the requirement of the grand jury's independent exercise of its discretion is a fixed star in our constitutional universe. For that reason, it is important to consider whether the way in which our courts today instruct grand jurors comports with the constitutional history of the institution. By my lights, the majority downplays evidence that the grand jurors in these cases were improperly instructed to the effect that their powers were limited to determining probable cause. Furthermore, the majority fails to accord appropriate deference to the elevated status of the grand jury as indicated in the Supreme Court's jurisprudence.[4]

To begin, the majority mistakenly characterizes the appellants' argument by contending that the appellants "insist" that

the instructions "specifically tell the grand jury that it has no obligation to charge if it finds probable cause." The appellants make no such demand. Rather, it is a suggestion, merely one of the possible resolutions proposed to cure the unconstitutional instructions. The appellants *actually* insist only on the following: that the instructions under consideration misleadingly and impermissibly conveyed to the grand jury that their sole function is to determine probable cause.

The instructions begin by telling the grand jurors that what would follow would outline their responsibilities. This prefatory emphasis is significant because the instructions go on to explain that "the purpose of the Grand Jury is to determine whether there is sufficient evidence to justify a formal accusation against a person." A grand juror paying close attention would conclude that the purpose of the grand jury is *singular* and that its discretion is constrained by the instruction.

This impression is confirmed again later in the charge: "Your task is to determine whether the government's evidence as presented to you is sufficient to cause you to conclude that there is probable cause." While there is little doubt that this is, standing alone, a proper statement of law, the instruction seems to compel the grand jury to indict as long as probable cause exists:

You should vote to indict where the evidence presented to you is sufficiently strong to warrant a reasonable person's believing that the accused is probably

---

*gation of Political Dissidents,* 7 Harv. C.R.-C.L. L.Rev. 432 (1972).

**3.** The Grand Jury Clause of the Fifth Amendment stands in contrast to the Warrant Clause of the Fourth Amendment; the decision whether cause exists to prosecute cannot be made solely by permanent government officials. *See* Akhil Reed Amar, *The Bill of*

*Rights: Creation and Reconstruction* 84–85 (1998).

**4.** Though I have no quarrel with how this panel addressed the *Apprendi* or prosecutorial misconduct issues, I would not need to reach those issues because of the disposition suggested in this dissent.

guilty of the offense with which the accused is charged.

These instructions are at odds with the constitutional history of the grand jury requirement. The grand jury's defining feature is independence. The Fifth Amendment deliberately inserts a group of citizens between the government's desire to bring serious criminal charges and its ability to actually do so. "It is a constitutional fixture in its own right[,] . . . [belonging] to no branch of the institutional Government, serving as a kind of buffer or referee between the Government and the people." *United States v. Williams,* 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) (internal citations omitted). Indeed, "the Fifth Amendment's 'constitutional guarantee *presupposes* an investigative body acting independently of either [the] prosecuting attorney *or judge.'* " *Id.* at 49, 112 S.Ct. 1735 (quoting *United States v. Dionisio,* 410 U.S. 1, 16, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973)) (emphasis in original; internal quotations omitted).[5]

The history of the adoption of the grand jury requirement in the Bill of Rights underscores its independent role.[6] And its independence was noted by courts at the founding of this Republic. *See United States v. Smith,* 27 F. Cas. 1186, 1188 (C.C.D.N.Y.1806) (No. 16341A) ("Grand juries are the offspring of free government; they are a protection against ill-founded accusations."). This pedigree attests that the grand jury's independence serves not only in the determination of probable cause, as these grand juries were instructed, but also to protect the accused from the other branches of government by acting as the "conscience of the community." *Gaither v. United States,* 413 F.2d 1061, 1066 n. 6 (D.C.Cir.1969) ("Since it has the power to refuse to indict even where a clear violation of law is shown, the grand jury can reflect the conscience of the community in providing relief where strict application of the law would prove unduly harsh.") (citation, internal quotation omitted). Indeed, even the government acknowledges that the grand jury has a function beyond merely establishing probable cause: quoting *United States v. Mechanik,* 475 U.S. 66, 74, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986) (O'Connor, J., concurring in the judgment) (quoting *Wood v. Georgia,* 370 U.S. 375, 390, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962)), the government avers that the grand jury serves the "invaluable function in our society of standing between the accuser and the accused . . . to determine whether a charge is founded upon reason or dictated by an intimidating power or by malice and personal ill will." And yet, the instructions in these cases say nothing about this function.

The significance of this second—and potentially protective—role should not be understated. Indeed, the strength of this understanding is emphasized in *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). There, the Supreme Court said:

> The grand jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not. In the hands of the grand jury lies the power to charge a greater

---

**5.** At least one scholar has suggested that the grand jury's alleged independence of the court makes it difficult for the Supreme Court to exercise its supervisory powers over it. *See* Susan W. Brenner, *The Voice of the Community: A Case for Grand Jury Independence,* 3 Va. J. Soc. Pol'y & L. 67, 124–26 (1995). Although Brenner's conclusion rests on a somewhat historically suspect premise—there are some cases that state that the grand jury *is* an arm of the Court—her claim would nonetheless be consistent with what *Williams* held, specifically, that *prosecutors* are not constitutionally required to disclose exculpatory material to the grand jury.

**6.** *See* sources cited in notes 1–3 and note 5.

offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a noncapital offense—all on the basis of the same facts. Moreover, "[the] grand jury is not bound to indict in every case where a conviction can be obtained." *United States v. Ciambrone,* 601 F.2d 616, 629 (1979) (Friendly, J., dissenting).

*Id.* at 263, 106 S.Ct. 617. Judge Friendly's dissent in *Ciambrone* itself cites powerful language on this protective role from another distinguished jurist, Judge John Minor Wisdom:

> By refusing to indict, the grand jury has the unchallengeable power to defend the innocent from government oppression by unjust prosecution. And it has the equally unchallengeable power to shield the guilty, should the whims of the jurors or their conscious or subconscious response to community pressures induce twelve or more jurors to give sanctuary to the guilty.

*United States v. Cox,* 342 F.2d 167, 189–90 (5th Cir.1965) (Wisdom, J., concurring specially).

Though grand jurors generally possess these acknowledged powers, the jurors in the cases before us were misled by these instructions, told that their powers are restricted to determining probable cause. This necessarily compromises their independence. The instructions admonish grand jurors further:

> You cannot judge the wisdom of the criminal laws enacted by Congress, that is, whether or not there should or should not be a federal law designating certain activity as criminal. That is to be determined by Congress and not by you. Furthermore, when deciding whether or

not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment.

This instruction improperly limits the jurors' discretion regarding the proper scope of application of federal criminal law, as well as matters of sentencing. Both limitations run afoul of traditional understandings of the grand jury. As to questioning the wisdom of a criminal law, consider the language from the *Gaither* decision: "Since it has the power to refuse to indict even where a clear violation of law is shown, the grand jury can reflect the conscience of the community in providing relief where strict application of the law would prove unduly harsh." *Gaither,* 413 F.2d at 1066 n. 6 (citation, internal quotation omitted).[7] How is it then that the grand jury lacks the power to consider the wisdom of a law applied to a particular case?

As to the severity of punishment, the Supreme Court in *Vasquez* stated that the grand jury has "the power to charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense[,] all on the basis of the same facts." *Vasquez,* 474 U.S. at 263, 106 S.Ct. 617. If grand jurors can choose, per *Vasquez,* between capital and non-capital offenses, how could they not be influencing the determination of punishment?

Finally, the grand jury's independence was further undermined when, in at least two of the three cases under consideration, the district court extolled the virtues of the representatives of the United States Attorney's office. This enthusiasm followed only moments after the grand jury was told that they could expect "candor, hones-

---

7. *See also In re Kittle,* 180 F. 946, 947 (S.D.N.Y.1910) (L.Hand, J.) ("One purpose of the secrecy of the grand jury's doings is to insure against this kind of judicial control. They are the voice of the community accusing its members, and the only protection from such accusation is in the conscience of that tribunal.").

ty and good faith" from the prosecutors who would be working with the grand jurors. One can only wonder: how truthful can these declarations be when prosecutors are free to deprive the grand jurors of exculpatory evidence, *United States v. Williams*, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), to provide unconstitutionally seized evidence, *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), and to present evidence otherwise inadmissible at trial, *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956)? More urgently, how independent can a grand jury be when they are told how wonderful the prosecutors are? The appellants quite properly assert that "a grand jury cannot be 'independent' if the prosecutors' virtues are extolled to them without mention of the prosecutors' ability to present to the grand jurors far less than the whole story."

I am not persuaded that the grand jurors here were instructed properly on their independent role and function. Certainly, the instructions mention the idea of independence, telling the grand jurors, for example, that they stood between the accused and the government, and that they "should" indict, not that they must or shall indict. Indeed, the word "independent" also appears a couple times in the instructions. But both "reminders" of independence cited by the majority—and they really do take on the appearance of an after-thought—occur in the context of tell-

ing the grand jurors that their duty is to determine probable cause.[8] The majority doesn't really grapple with the fact that although the grand jury is told it is independent, its independence is narrowly circumscribed. As to the "should" and "shall" distinction, it is a lawyer's distinction—not a difference to which most lay people sitting as grand jurors are likely alert.

Moreover, appellants correctly challenge the majority's inference that the relief they seek is necessarily a nullification instruction. A grand jury could be instructed using the language of *Vasquez*, which does not suggest nullification. Or, it could be told either that a showing of probable cause is a necessary requirement for indictment without saying more, or that probable cause is a necessary consideration, but not the only one. Doubtless, some of these options may be more vexatious than others. My own predilection would offer language instructing the jurors that they are the conscience of the community and are not bound to indict in every case where a conviction can be obtained. This may have the effect of creating more dialogue among grand jurors and prosecutors. Such exchange would be a step in the direction of greater civic participation in the practice of federal criminal justice. Of course, my preferences are immaterial: if the instructions are unconstitutional, it is not the job of this panel to rewrite them here and now. Regardless of how new instructions might turn out, as they stand

---

**8.** While this is definitely the case with the first example offered by the majority, one may plausibly ask whether such qualification applies to the second time the instructions stressed the grand jury's independence from the government. My own view is that it does. Consider the instructions there: "You must depend on your own independent judgment, never becoming an arm of the United States Attorney's Office. If the facts suggest that you should not indict, then you should not do

so even in the face of the opposition or statements of the United States Attorney." This language undercuts the argument that the instructions impermissibly biased the jury in favor of the U.S. Attorney's Office, but not the general claim that they erroneously limited the grand jury to determining probable cause. As appellant Leyva put it, the grand jury was instructed to act independently as to only a portion of their responsibilities: the probable cause determination.

now they are constitutionally unsound because they actively mislead grand jurors into thinking they lack powers which, as articulated by *Vasquez*, are clearly vested in them.[9]

Even if there were no liminal space between the instructions given and a nullification instruction, it is worth examining why the arguments against nullification in the petit jury context should not be uncritically applied to the grand jury context. As a preliminary matter, neither the Supreme Court nor the Ninth Circuit has prohibited a nullification—or, as some might call it, a full disclosure—instruction for grand juries. The cases prohibiting such instructions relate only to petit juries, not grand juries.[10] Second, there is an important distinction between the two groups: with petit juries, jeopardy attaches, whereas with grand juries, a new prosecution effort can begin. *See Williams*, 504 U.S. at 49, 112 S.Ct. 1735. Because evidence can always be re-presented to a second grand jury, it is far from inevitable that justice will not be done if grand jurors were given a full disclosure instruction. Third, because the Framers placed a high value on the kinds of powers articulated by *Vasquez* for grand juries, it would be unjustifiably paternalistic to fail to tell the grand jurors the scope of their constitutional powers over charging decisions specifically entrusted to their judgment. Finally, it is a mistake to conclude that a full disclosure instruction to a grand jury would subvert the rule of law. If our constitutional system permits the grand jury to act either on its "conscience" or its "prejudice," [11]

9. The majority suggests that the authorities cited in this dissent are not strictly speaking authorities as they do not compel reversal. This is true. The non-Supreme Court cases are not binding both because they are out of circuit and because they are dicta.

As to *Vasquez*, however, it is not to be lightly disregarded. Though it is dicta, it was the majority opinion and reflected a venerated understanding of the grand jury. *Cf. Sherman v. Community Consol. Dist. 21*, 980 F.2d 437, 448 (7th Cir.1992) ("Plaintiffs observe that the Court sometimes changes its tune when it confronts a subject directly. True enough, but an inferior court had best respect what the majority says rather than read between the lines. [W]e take [the Court's] assurances seriously. If the Justices are just pulling our leg, let them say so.").

Moreover, the majority itself presents no cases that dictate the result here. Instead, its opinion quotes various commentators noting the diminishing of federal grand jury independence. *See ante* at 1162. The decline in the grand jury's autonomy, according to the majority, "would not be cured by a change in the language" of the charge. *Id.* at 1162. But nowhere does the majority explain why a constitutionally kosher instruction would fail to breathe any spirit into the otherwise and increasingly moribund body of the grand jury.

What we face is a matter of first-impression, and although we do not write on an entirely blank slate, it is an open-textured issue.

10. *See, e.g., United States v. Powell*, 955 F.2d 1206, 1213 (9th Cir.1991); *United States v. Simpson*, 460 F.2d 515, 519–20 (9th Cir. 1972).

11. The difficulty of distinguishing between conscience and prejudice was highlighted long ago, as was one possible solution to the difficulty. *See* Thomas Hobbes, *Leviathan* 39–40 (Richard Tuck ed., Cambridge Univ. Press 1991) (1651) ("But whatsoever is the object of any man's appetite or desire, that is it which he for his part calleth good; and the object of his hate and aversion, evil; and of his contempt, vile and inconsiderable. For these words of good, evil, and contemptible are ever used with relation to the person that useth them: there being nothing simply and absolutely so; nor any common rule of good and evil to be taken from the nature of the objects themselves; but from the person of the man, where there is no Commonwealth; or, in a Commonwealth, from the person that representeth it; or from an arbitrator or judge, whom men disagreeing shall by consent set up and make his sentence the rule thereof.").

then it hardly makes sense to say that a grand juror who chooses to not indict despite probable cause is acting lawlessly. Rather, that action lies fully within the discretion delegated by the Constitution.[12]

Because the instructions in these cases actively misled the grand jurors into thinking their powers are more constrained than they in fact are, they are unconstitutional. Which raises the next question: if error, is it a structural error, or is it subject to harmless error review?

My answer, based on *Vasquez*, is that it is a structural error. In *Vasquez*, the Supreme Court *presumed* prejudice, concluding that the systematic exclusion of blacks from the grand jury pool amounts to structural error, for which prejudice to the defendant need not be shown. This result issued, despite the state's argument that "requiring a State to retry a defendant, sometimes years later, imposes on it an unduly harsh penalty for a constitutional defect bearing no relation to the fundamental fairness of the trial." *Vasquez*, 474 U.S. at 262, 106 S.Ct. 617. The *Vasquez* Court rejected this contention, noting that fundamental flaws, such as racial discrimination in the grand jury, "undermine[ ] the structural integrity of the criminal tribunal itself, and [are] not amenable to harmless-error review." *Id.* at 263–64, 106 S.Ct. 617.

To determine whether the presumption of prejudice attaches, the Supreme Court demands that we employ a traditional test: to determine whether "the structural pro-

tections of the grand jury have been so compromised as to render the proceedings fundamentally unfair." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 257, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). But the high court also stated that the courts should look to whether any inquiry into harmless error would require unguided speculation. *Id.*

The traditional test is ultimately unhelpful because it is hard to say with authority that the deprivation of an adequately-instructed grand jury is or is not "fundamentally unfair." [13] But the latter, and slightly more helpful, test does seem satisfied here, even though at first blush, it appears that the defendants would have been convicted absent the error. Gamboa and Leyva were caught, after all, with massive amounts of drugs in their cars. Marcucci, notwithstanding his drug addictions and mental infirmities, knew what he was doing; in fact, after talking with the police, he admitted committing a "premeditated robbery."

Nonetheless, this is an area of "unguided speculation." Perhaps a grand jury would have exercised its discretion in favor of one or all of the defendants here because, among other things, Leyva was young and a first time offender; that marijuana (versus heroin or cocaine) was involved in both Gamboa and Leyva's cases; and Marcucci, who apparently looks patently unthreatening, bungled a rather pathetic and non-intimidating but no less stupid crime.[14] Put differently, it's conceivable that a grand jury made aware of

---

12. The majority seems to suggest, *ante* at 1163, that the possibility of grand juries refusing to indict "based on local politics, racial or other discrimination, or anti-government sentiment" is an outcome so nefarious that we should prevent it, in part, by misleading the grand jurors about their powers. I agree that the possibility of such outcomes is real, but ours is not to question the choice the Framers appear to have made.

13. *See Hobbes, supra* note 11. *Cf. Brown v. Allen,* 344 U.S. 443, 540, 73 S.Ct. 397 (1953)

("We are not final because we are infallible, but we are infallible only because we are final.") (Jackson, J., concurring).

14. As the majority notes, what the grand jury might have done or might have known is speculative. It is a constitutional black box. But that doesn't render less likely the possibility that the grand jury, properly instructed, would provide relief from the strict applica-

its role as "conscience of the community" would have provided "relief where strict application of the law would prove unduly harsh." *Gaither*, 413 F.2d at 1066 n. 6.

As one appellant noted, "a reviewing court can never know whether or not an unbiased and properly constituted grand jury would have simply declined to indict at all or might have charged a lesser offense." Where structural error occurs, it is no adequate reply to point out that the appellants did not demonstrate that "irregularities" existed such that the presumption of regularity should be disturbed. For it is precisely the "regular" and "traditional" functioning of the grand jury—its potential to exercise either justice-guided discretion or compassion-based mercy even against a finding of probable cause—that was hobbled by the instructions of the proceedings in these cases. In short, the appellants were denied the "traditional functioning of the institution that the Fifth Amendment demands." *Williams*, 504 U.S. at 51, 112 S.Ct. 1735.[15]

Because the defendants here were convicted after a grand jury was erroneously instructed, and because the erroneous instructions constituted a substantial impediment to the regular functioning of the

grand jury as envisioned by its constitutional history, I would reverse the convictions, dismiss these indictments, and allow the government to re-present evidence to a grand jury properly instructed as to its independent role.[16]

---

tion of the law in its role as "conscience of the community." Moreover, the majority provides no reason for its assertion that the factors discussed in the text, *e.g.*, youth, ineptitude, or type of drug, should not influence a decision to indict as much as a decision to sentence a particular amount. A particularly merciful conscience of the community might think that it is precisely those factors that should preclude prosecution altogether. One could imagine a grand jury being reluctant to indict a poor mother whose lack of real opportunities forced her to prostitution or delivering drugs in order to pay for her children's food or shoes.

15. If the error here were not structural, but rather merely subject to harmless error review, it would be inappropriate for us to rule

because the district court, having determined there was no error on the grand jury question, never ruled on what prejudice, if any, was experienced by any of the defendants.

16. While I am mindful that my proposed resolution would impose a burden on the government, the Supreme Court's decisions of late remind us that our obligations under the Constitution are not always measured against the metric of efficiency. *See, e.g., Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435, (2000) (O'Connor. J., dissenting) (noting that *Apprendi* will "unleash a flood of petitions by convicted defendants seeking to invalidate their sentences"); *Ring v. Arizona*, —— U.S. —— at ——–——, 122 S.Ct. 2428, 153 L.Ed.2d 556 at ——–—— (2002) (O'Connor, J., dissenting) (expressing similar fears that *Ring* will strain judicial resources).