**UNITED STATES of America,
Plaintiff,**

v.

**Edward ROSENTHAL, Defendant.**

**No. CR 02–00053 CRB.**

United States District Court,
N.D. California.

May 16, 2003.

---

**2.** The opinion does not disclose the basis for the $2,500 differential between the loss and

the claim.

George Bevan, U.S. Attorney's Office, San Francisco, CA, for plaintiff.

Robert V. Eye, Topeka, KS, Dennis P. Riordan, Joseph D. Elford, San Francisco, CA, William M. Simpich, Oakland, CA, for defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR NEW TRIAL

BREYER, District Judge.

### INTRODUCTION

On January 31, 2003, a jury convicted defendant Edward Rosenthal of violating the federal Controlled Substances Act. The jury found that Rosenthal had manufactured and conspired to manufacture marijuana in violation of 21 U.S.C. §§ 841 and 846, and had maintained a place for the manufacture of marijuana in violation of 21 U.S.C. § 856. The charges arose out of Rosenthal's operation of an indoor marijuana-growing facility in Oakland, California. Now pending before the Court is Rosenthal's motion for a new trial. In light of the parties' papers and extensive record, the Court concludes that oral argument is unnecessary.

Rosenthal does not contend that the evidence was insufficient to support his conviction. Nor could he; in fact, there is overwhelming and uncontradicted evidence that he cultivated hundreds of marijuana plants for distribution to medical marijuana centers. Rather, the thrust of Rosenthal's argument is that the Court should have allowed him to present evidence and argument designed to encourage the jury to disregard the controlling law.

At various times during the proceedings the Court has heard oral argument on the issues raised by defendant's motion. In order to appreciate this argument and the Court's rulings during these proceedings, it may be helpful to understand the context in which these matters were originally presented to the Court.

Prior to commencement of trial, the government filed motions in limine to exclude evidence of a "medical marijuana" defense aimed at jury nullification. The government maintained that evidence of Rosenthal's motive or justification for the cultivation of marijuana could not be presented to the jury. In making this argument, the government relied on a fundamental rule of evidence, which requires that only relevant evidence be considered by the jury and that irrelevant evidence be excluded. *See* Fed.R.Evid. 402. Since the elements of the criminal offenses at issue involve only the knowing or intentional manufacturing of marijuana and *not* the purpose for which the marijuana was grown, the government claimed that evidence of medical purposes as well as the defendant's belief that he was lawfully engaged in this enterprise was inadmissible.

Accordingly, the Court was required at the outset to determine whether such evidence...i.e., testimony demonstrating Rosenthal's desire to help people who suffer from serious debilitating illnesses as well as evidence of his belief that he was authorized by the government to engage in the activity...was relevant to any issue the jury had to determine in order to fairly adjudicate his guilt or innocence. If so, such evidence would be admitted; if not, it would have to be excluded because to admit it would violate the Federal Rules of Evidence and permit the jury to base its verdict on impermissible grounds.

In essence, the defense offered three purported justifications for admissibility. First, it suggested that this evidence would permit the jury to consider whether to acquit notwithstanding the facts and established law. This notion, often referred to as jury nullification, recognizes the *power* of the jury to refuse to apply the law as instructed by the Court. Since a jury has this power, the defense argued, it was entitled to receive evidence upon which it could choose to exercise its power.

■ While jury nullification is a "fact" of judicial life, the United States Supreme Court has explicitly recognized that juries have no right to nullify. *See Standefer v. United States,* 447 U.S. 10, 22, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980). As such, evidence which is otherwise inadmissible does not become admissible in order to facilitate jury nullification. Among the many reasons for discouraging such a practice is that nullification can lead to grossly unequal protection of the laws. To permit nullification in cases where a defendant has a "good" reason for his conduct when motive is not an element of the crime allows jurors to use their individualized set of beliefs as to "good" reasons to be determinative of guilt or innocence. Reasons, good or bad, are of course relevant to sentencing, but they are not accepted by courts as a basis for verdicts.

Furthermore, in light of the United States Supreme Court speaking directly on this issue of nullification, any change in the law should come from that Court, not this one.

A second reason offered for the admissibility of evidence of Rosenthal's state of mind relates to the Controlled Substances Act and the conduct of the Oakland City Council in response to California Proposition 215. The defense maintained that Rosenthal was deputized by the City to cultivate medical marijuana, and that he was therefore immune from federal prosecution pursuant to Section 885(d) of the Controlled Substances Act. In effect, the defense argued, local government through enactment of ordinances can effectively immunize a defendant from federal prosecution. The scope of the immunity under Section 885(d) is a legal determination to be made by a court, not a jury. After extensive briefing and argument, the Court concluded that this section was *not* designed to permit a town, or state for that matter, to place its agents out of the reach of a federal criminal law. Moreover, the Controlled Substances Act was intended to set forth a uniform national drug policy. To apply immunity to this defendant based upon his conduct would, of course, effectuate an exception to this drug policy. In other words, as there is no right to jury nullification, nor can there be nullification by local governments. Since the Civil War this country has recognized that whatever the views of local governments, such views do not control the enforcement of federal law. There is no local "opt out" provision in the Controlled Substances Act, even though many would question the wisdom of applying this Act to those who furnish medical marijuana. As is explained in more detail below, nothing in Section 885(d), its predecessor statutes or legislative history remotely supports the interpretation proffered by Rosenthal.

Finally, the defense offered a third reason to admit evidence of Rosenthal's state of mind. Rosenthal claimed that the government by its conduct led him to believe that he would not be prosecuted for this offense. While the availability of this entrapment defense requires *federal* government conduct, much of the defendant's evidentiary proffer relied on conduct by *state* and *local* governments. After considering the evidentiary offering, the Court concluded that there was no evidence from which a jury could conclude that the *federal* government's conduct led the defendant to believe that he was immune from criminal liability.

Since these three reasons offered by the defense did not support a finding that motive or state of mind was relevant to the issue of guilt or innocence, the Court concluded that the proffered evidence should not be admitted. The Court notes that nothing contained in this order or in any previous order of the Court constitutes a

determination that the defendant did not believe he was authorized by the City of Oakland to cultivate marijuana. Such evidence is appropriate for consideration at sentencing. It is simply not relevant to the question of guilt or innocence.

With this context in mind, the Court will now turn to the arguments made by Rosenthal in his Motion for a New Trial.

## BACKGROUND

■ Federal law prohibits the manufacture, distribution or sale of marijuana for any purpose. *See* 21 U.S.C. § 841; *United States v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 489–90, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001). In 1996, California voters enacted the "Compassionate Use Act," also known as Proposition 215. Proposition 215 makes it legal under California law for seriously ill patients and their primary caregivers to possess and cultivate marijuana for use by the seriously ill patient if the patient's physician recommends such treatment. To be precise, it exempts a seriously ill patient, or the patient's primary caregiver, from prosecution under California Health and Safety Code section 11357, relating to the possession of marijuana, and section 11358, relating to the cultivation of marijuana. *See* Cal. Health & Safety Code § 11362.5(d) It does not make it legal under California law for persons other than a seriously ill patient or his caregiver to possess or cultivate marijuana. *See People v. Galambos,* 104 Cal.App.4th 1147, 1165–67, 128 Cal.Rptr.2d 844 (2002); *People ex rel. Lungren v. Peron,* 59 Cal. App.4th 1383, 1400, 70 Cal.Rptr.2d 20 (1997); *People v. Trippet,* 56 Cal.App.4th 1532, 1545–46, 66 Cal.Rptr.2d 559 (1997).

In July 1998, the City of Oakland passed Ordinance No. 12076, also known as Chapter 8.42. The expressed purpose of Chapter 8.42 was to "ensure safe and affordable medical cannabis pursuant to the Compassionate Use Act of 1996," and to "provide immunity to medical cannabis provider associations pursuant to Section 885(d) of Title 21 of the United States Code." That section provides that "no criminal or civil liability shall be imposed" under the Controlled Substances Act "upon any duly authorized officer of any State, territory or political subdivision thereof ... who shall be lawfully engaged in the enforcement of any law or municipal ordinance relating to controlled substances." In an attempt to create immunity from liability under federal law for suppliers of medical marijuana, Chapter 8.42 provided that the City could designate a medical cannabis provider association and its employees and agents as officers of the City of Oakland to the extent they were "enforcing" the purpose of the Ordinance to provide safe medical cannabis to seriously ill patients. Chapter 8.42, § 3.

Following the passage of Chapter 8.42, Oakland designated the Oakland Cannabis Buyers Cooperative ("OCBC") to distribute marijuana in accordance with the new ordinance. At the time of the OCBC's designation, a federal court order was issued barring the OCBC from cultivating or distributing marijuana in violation of federal law. *See United States v. Cannabis Cultivators Club,* 5 F.Supp.2d 1086 (N.D.Cal.1998) (the "OCBC lawsuit").

Two weeks after the designation, this Court ruled in the OCBC lawsuit that notwithstanding Chapter 8.42, 21 U.S.C. § 885(d) does not immunize from federal liability the OCBC's manufacture and distribution of marijuana. *See United States v. Cannabis Cultivator's Club,* No. C 98–0088 CRB, Order Re: Motion To Dismiss (N.D.Cal. Sep. 3, 1998). The day after the Court issued this ruling, Jeffrey Jones, the OCBC's Executive Director, gave Rosenthal a letter stating that while Rosenthal "is acting within the scope of [his] duties

as an agent of the [OCBC], [he is] deemed a duly authorized 'officer of the City of Oakland' and as such [is] immune from civil and criminal liability under Section 885(d) of the federal Controlled Substances Act." All of the conduct for which Mr. Rosenthal was convicted occurred after Jones purported to make Rosenthal an agent of the OCBC.

## PROCEDURAL HISTORY

In February 2002, the federal government indicted Rosenthal for growing marijuana indoors at 1419 Mandela Parkway in Oakland, California, during the period October 2001 through February 2002. Rosenthal subsequently moved to dismiss the indictment on several grounds, including arguments that his prosecution exceeds the government's powers under the Commerce Clause and violates the Tenth Amendment of the United States Constitution, and that the government had engaged in selective prosecution.

Rosenthal also moved for dismissal on the ground of "official immunity." He argued that the City of Oakland had made him a city official for the purpose of cultivating marijuana for distribution to medical marijuana clubs and therefore he was immune from prosecution pursuant to section 885(d) of the Controlled Substances Act.

Finally, Rosenthal moved to dismiss the indictment on the ground of "entrapment by estoppel." He argued that Rosenthal reasonably relied upon the representations of Oakland city officials that he would be immune from federal prosecution and that these representations, coupled with the plain language of the statute itself, estopped the federal government from prosecuting him for violations of the Controlled Substances Act.

At the January 6, 2003 hearing on Rosenthal's motions to dismiss, Rosenthal argued that he had evidence that federal officials had "acquiesced" in the City of Oakland's deputization of Rosenthal for the purpose of cultivating marijuana. In light of that representation, and over the objection of the government, the Court granted Rosenthal an evidentiary hearing to present his evidence supporting his entrapment by estoppel defense. The hearing was held on January 9, 2003. The Court subsequently denied all of Rosenthal's motions to dismiss.

The government moved in limine to exclude Rosenthal from presenting a "medical marijuana" defense and to exclude evidence and argument aimed at jury nullification. It also moved to exclude any evidence or argument related to Rosenthal's proposed entrapment-by-estoppel defense, including evidence that the City of Oakland had made him a city official for the purpose of cultivating marijuana. After oral argument, and after providing Rosenthal with the opportunity to present additional evidence, the Court granted the government's motions and the case proceeded to trial and verdict.

Rosenthal now moves pursuant to Federal Rule of Criminal Procedure 33 for a new trial on the ground that the Court erred by excluding his defense of entrapment by estoppel. He also argues that the Court improperly excluded nineteen jurors who expressed pro-medical marijuana beliefs and that the Court erroneously instructed the jury with respect to its right to nullification. Finally, he argues that he is entitled to a new trial because of juror and prosecutorial misconduct.

## DISCUSSION

### I. Section 885(d) Immunity

■ Rosenthal does not renew his Section 885(d) immunity defense in his new trial motion. Nevertheless, because the

issue is intricately intertwined with his estoppel argument, the Court will briefly address it here.

In his motion to dismiss the indictment, Rosenthal contended that because he was cultivating marijuana as an agent for the OCBC, and because the City had designated the OCBC and its employees and agents as city officials for the purpose of enforcing Chapter 8.42, he is immune from criminal prosecution under the plain language of Section 885(d).

 Courts "interpret a federal statute by ascertaining the intent of Congress and by giving effect to its legislative will." *United States v. Sagg,* 125 F.3d 1294, 1295 (9th Cir.1997). The starting point "is the language of the statute itself." *United States v. Buckland,* 289 F.3d 558, 564 (9th Cir.2002) (en banc) (citations and internal quotations omitted), *cert denied, Buckland v. United States,* 535 U.S. 1105, 122 S.Ct. 2314, 152 L.Ed.2d 1067 (2002). "Where the language is not dispositive, [courts] look to the congressional intent 'revealed in the history and purposes of the statutory scheme.'" *Id.* at 565 (quoting *Adams Fruit Co. v. Barrett,* 494 U.S. 638, 642, 110 S.Ct. 1384, 108 L.Ed.2d 585 (1990)). The Court's duty "is to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested." *Sagg,* 125 F.3d at 1295. Rosenthal's conduct does not fall within the language of the immunity statute and is contrary to the expressed purpose of the Controlled Substances Act.

 First, as the Court noted in its September 3, 1998 Order in the OCBC lawsuit, for an official to be "lawfully engaged" in the enforcement of a law relating to controlled substances, and therefore entitled to immunity, the law which the municipal official is "enforcing" must itself be consistent with federal law. Chapter 8.42, to the extent it provides for the cultivation and distribution of medical marijuana, is not lawful under federal or state law.[1]

 Second, Section 885(d) applies to the "enforcement" of a law related to controlled substances. Rosenthal argues that by cultivating marijuana for medical use he was "enforcing" Chapter 8.42. Chapter 8.42 itself states that a City-designated medical cannabis provider shall "enforce" the purpose of the Chapter to ensure that seriously ill Californians have access to marijuana. To "enforce," however, generally means "to compel someone to do something or not to do something." *Gulf Life Ins. Co. v. Arnold,* 809 F.2d 1520, 1523 (11th Cir.1987). Thus, as used in Section 885(d), to "enforce" a law related to a controlled substance means to compel compliance with the law. Rosenthal's conduct cannot reasonably be construed as "enforcing" Chapter 8.42, assuming the Chapter is a law related to controlled substances. At best, Rosenthal was implementing or facilitating the purpose of the statute; he was not compelling anyone to do or not to do anything.

Moreover, Rosenthal's interpretation of Section 885(d) directly contradicts the purpose of the Controlled Substances Act. As the Supreme Court has held, the Act "reflects a determination that marijuana has no medical benefits worthy of an exception (outside the confines of a Government-approved research project)." *United States*

---

1. California Proposition 215 does not permit cultivation or distribution of medical marijuana except by a patient or the patient's primary caregiver for the patient's personal use. *See* Cal. Health & Safety Code § 11362.5(d) (Compassionate Use Act applies "to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient").

*v. Oakland Cannabis Buyers' Cooperative,* 532 U.S. 483, 491, 121 S.Ct. 1711, 149 L.Ed.2d 722 (2001); *see also id.* at 493, 121 S.Ct. 1711 ("It is clear from the text of the Act that Congress has made a determination that marijuana has no medical benefits worthy of an exception."). To hold that Section 885(d) applies to the cultivation of marijuana for a medical cannabis club would conflict with the stated purpose of the Controlled Substances Act. "[L]awfully engaged" in "enforcing a law related to controlled substances" must mean engaged in enforcing, that is, compelling compliance with, a law related to controlled substances which is consistent...or at least not inconsistent...with the Controlled Substances Act. Section 885(d) cannot reasonably be read to cover acting pursuant to a law which itself is in conflict with the Act.

▮▮▮ Rosenthal also argued that under the "rule of lenity" the Court must interpret Section 885(d) to cover his conduct. The "'touchstone' of the rule of lenity is 'statutory ambiguity.'" *Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 65 L.Ed.2d 205 (1980) (*quoting Lewis v. United States,* 445 U.S. 55, 65, 100 S.Ct. 915, 63 L.Ed.2d 198 (1980)). A statute is not "ambiguous" for the purposes of lenity merely because it is *"possible* to articulate a construction [different from] that urged by the Government." *Moskal v. United States,* 498 U.S. 103, 108, 111 S.Ct. 461, 112 L.Ed.2d 449 (1990). The rule of lenity applies only where "a reasonable doubt persists about a statute's intended scope even *after* resort to 'the lan-

guage and structure, legislative history, and motivating policies' of the statute." *Id.* Congress's essentially absolute ban on the cultivation of marijuana for any purpose leaves no doubt that Section 885(d) does not immunize Rosenthal's conduct.[2]

## II. Entrapment by Estoppel

▮▮▮ Rosenthal also argues that regardless of whether Section 885(d) applies to his conduct, the Court erred by preventing him from presenting to the jury his affirmative defense of "entrapment by estoppel." A district court may require a criminal defendant to make a pretrial offer of proof to demonstrate that the evidence in support of an affirmative defense, including entrapment by estoppel, is sufficient as a matter of law to satisfy the elements of the defense. *See United States v. Mack,* 164 F.3d 467, 474 (9th Cir.1999); *United States v. Brebner,* 951 F.2d 1017, 1027 (9th Cir.1991). If the defendant fails to present sufficient evidence, the district court may preclude the defendant from presenting the defense at trial, as well any evidence supporting the defense. *See United States v. Moreno,* 102 F.3d 994, 997–99 (9th Cir.1996) (holding that evidence related to an affirmative defense is not admissible if the defendant fails to make a prima facie case of the defense). The Court concludes, as it did pretrial, that Rosenthal has failed to produce evidence sufficient to support his proposed defense.

▮▮▮ "The entrapment-by-estoppel defense applies when an authorized govern-

---

**2.** In his reply memorandum in support of his Motion for a New Trial, Rosenthal argues for the first time that his conviction should be dismissed or a new trial granted based on the "good faith" or "qualified" immunity recognized by the Supreme Court in *United States v. Lanier,* 520 U.S. 259, 270–71, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997). Rosenthal's new defense is untimely. It was not raised

pretrial, during trial, or even in his Motion for a New Trial. Accordingly, the Court is without jurisdiction to consider this new ground for vacating Rosenthal's conviction. *See United States v. Cook,* 705 F.2d 350, 351 (9th Cir.1983) ("Because Rule 33's time limitations are jurisdictional, a district court is powerless to consider an untimely motion for a new trial.").

ment official tells the defendant that certain conduct is legal and the defendant believes the official." *United States v. Hancock*, 231 F.3d 557, 567 (9th Cir.2000). The defense is based "on a due process theory which focuses on the conduct of the government officials rather than on a defendant's state of mind." *United States v. Brebner*, 951 F.2d 1017, 1025 (9th Cir. 1991).

To invoke entrapment by estoppel a defendant must make a prima facie showing of two elements. First, the defendant must "demonstrate 'affirmative misleading' on the part of a federal government official." *Hancock*, 231 F.3d at 567. "[T]he defendant must show 'that the government affirmatively told him the proscribed conduct was permissible.'" *Id.* (quoting *United States v. Ramirez–Valencia*, 202 F.3d 1106, 1109 (9th Cir.2000)). Moreover, the government official who misled the defendant must be a "federal government official empowered to render the claimed erroneous advice, or … an authorized agent of the federal government who … has been granted authority to render such advice." *Brebner*, 951 F.2d at 1027; *see also United States v. Mack*, 164 F.3d 467, 474 (9th Cir.1999) (affirming district court's refusal to instruct on entrapment-by-estoppel defense on the ground that the defendant did not rely on the advice of a federal official or agent). Second, the defendant must show that he reasonably relied on the federal official's misleading statement. "A defendant's reliance is reasonable if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *Ramirez–Valencia*, 202 F.3d at 1109 (quoting *United States v. Lansing*, 424 F.2d 225, 227 (9th Cir.1970)).

Rosenthal offers two theories of how he was entrapped: (1) government officials misled him into believing that he would be immune from prosecution under federal law pursuant to Section 885(d); and (2) government officials misled him into believing that he would not be prosecuted for violations of the Controlled Substances Act. With respect to both of these theories, Rosenthal failed to offer evidence as to the first element of the defense, namely, that federal officials affirmatively misled him.

## A. Section 885(d) immunity

Rosenthal candidly testified that no federal official ever told him that his cultivation of marijuana did not violate federal law:

Q: Did any federal official ever tell you, Mr. Rosenthal, that your cultivation activity was not a federal offense? When I say "your cultivation activity," I mean at 1419 Mandela Parkway in Oakland.

A: No.

Reporter's Transcript of Proceedings ("RT") 69:11–15 (Jan. 9, 2003). Rosenthal nonetheless argues that the language of Section 885(d) itself and this Court's September 3, 1998 decision in the OCBC lawsuit constitute "affirmative misleading" by the federal government to the effect that he would be immune from liability for his cultivation of marijuana.

Section 885(d) is not an affirmatively misleading statement of the law. Section 885(d) provides that a municipal officer is immune from liability for lawfully enforcing a law related to controlled substances; it is not a representation that the cultivation of marijuana for distribution to a medical cannabis club in violation of federal law is immune. Rosenthal and local officials apparently *interpreted* Section 885(d) as applying to Rosenthal's conduct, but Section 885(d) itself does not supply that interpretation.

The cases upon which Rosenthal relies are distinguishable because the defendants in those cases relied not on a statute itself but rather on an interpretation of the statute by a governmental entity. In *United States v. Pennsylvania Industrial Chemical Corp.*, 411 U.S. 655, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973), the Supreme Court held that the defendant should have been allowed to present a defense of entrapment by estoppel based on the Army Corp of Engineers' "longstanding, official administrative construction" of the statute at issue as not applying to the defendant's conduct. *Id.* at 670–74, 93 S.Ct. 1804. Similarly, in *Commonwealth v. Twitchell*, 416 Mass. 114, 617 N.E.2d 609 (1993), the Massachusetts Attorney General had issued an opinion which could reasonably be read as representing that "parents who fail to provide medical services to children on the basis of religious beliefs are not subject to criminal prosecution in any circumstances." *Id.* at 126–27, 617 N.E.2d 609. Rosenthal has not offered any evidence that a federal official or agency has even arguably construed Section 885(d) to immunize conduct similar to Rosenthal's crimes.

 Prior to trial Rosenthal did argue that this Court's September 3, 1998 Order denying the OCBC defendants' Section 885(d) motion to dismiss could be reasonably construed by a lay person as a representation that Rosenthal's conduct would be immune. Nothing in that Order, however, could be so construed. The Court ruled that Section 885(d) did not apply to the OCBC defendants (including Jeffrey Jones-the very person who allegedly "deputized" Rosenthal as an agent of the OCBC) because, among other reasons, it does not immunize a municipal officer's "enforcement" of Chapter 8.42, a law which itself is inconsistent with the Controlled Substances Act. Moreover, Rosenthal testified that he did not even become aware of the Order until after he was arrested and he proffered no evidence that any other person relied upon the Order.

 Rosenthal also testified that Oakland officials never represented that they were speaking on behalf of the federal government:

Q: Did any Oakland City official ever represent to you that they were purporting to speak on behalf of the federal government in any way?

A: No.

RT 69:21–24 (Jan. 9, 2003). He nonetheless argues that the City officials who adopted Chapter 8.42 and sanctioned Rosenthal's conduct were in fact "agents" of the federal government for the purpose of his estoppel defense because local officials have the power to "create or designate officials who will enjoy immunity from federal prosecution." Reply In Support of Motion for a New Trial at 17. He likens the Oakland officials to the gun dealers in *United States v. Tallmadge*, 829 F.2d 767 (9th Cir.1987).

In *Tallmadge*, a federally licensed gun dealer told the defendant that he could legally purchase a gun. The Ninth Circuit held that the dealer was a federal agent for the purpose of an entrapment-by-estoppel defense to the charge of being a felon in possession of a gun:

Congress has not only granted certain persons the exclusive right to engage in the business of selling firearms, it has also given them the affirmative duty of inquiring of a prospective buyer whether he has a criminal record that would make it unlawful for him to purchase a firearm.... In addition, the Treasury Department requires licensees to inform buyers concerning the restrictions imposed by Congress on the purchase of firearms. Clearly, the United States Government has made licensed firearms dealers federal agents in connection with

the gathering and dispensing of information on the purchase of firearms. *Id.* at 774. Congress has not given local entities any right to cultivate and distribute marijuana, and it has not imposed on local entities the duty of determining whether a person may legally cultivate marijuana or of advising marijuana growers of the legality of their conduct under federal law. *Tallmadge* does not support Rosenthal's argument that the City officials were federal agents.

### B. Statements of Drug Enforcement Agency Supervisor Mike Heald

■ In support of his motion to dismiss the indictment, Rosenthal submitted the declaration of Mary Pat Jacobs. Jacobs is a spokesperson for the Sonoma Alliance for Medical Marijuana ("Sonoma Alliance"). She attested that on several occasions in 1999, Drug Enforcement Agency ("DEA") Supervisor Mike Heald "attended meetings between law enforcement and the Sonoma Alliance and stated that the DEA was not interested in interfering with county efforts to implement" Proposition 215. Jacobs Decl. ¶ 2 (Dec. 2002). After the evidentiary hearing on Rosenthal's entrapment defense, Rosenthal submitted a supplemental declaration from Jacobs. She attested further that during the years 2000–2001 she told Rosenthal "about my conversation with Mike Heald concerning the DEA's decision to not interfere with Sonoma County's efforts to implement" Proposition 215. Jacobs Decl. (Jan. 16, 2003). Rosenthal submits that Heald's statement is evidence of an affirmative misrepresentation that the federal government would not prosecute someone in his position.

The Court disagrees. Heald did not make assurances concerning the DEA's activities anywhere outside Sonoma County. Even if the statement constituted an affirmative misrepresentation with respect to the DEA's activities in *Sonoma*, Rosen-

thal has not identified any case suggesting that by making this statement the federal "government affirmatively told [anyone] the proscribed conduct was permissible" in any other county. *Ramirez–Valencia*, 202 F.3d at 1109. As the Ninth Circuit has noted, to succeed on a theory of entrapment by estoppel a defendant "must do more than show that the government made 'vague or even contradictory statements.'" *Id.* (quoting *Raley v. Ohio*, 360 U.S. 423, 438, 79 S.Ct. 1257, 3 L.Ed.2d 1344 (1959)).

In sum, Rosenthal has failed to proffer any evidence of the first element of the defense of entrapment by estoppel, namely, evidence of affirmative misleading by an authorized federal official or federal agent to the effect that Rosenthal's conduct was legal, or at least that he would be immune from prosecution or would not be prosecuted.

### III. Voir Dire

■ Rosenthal argues that the Court "stacked the deck" against him by treating prospective jurors who were allegedly "pro-government" more leniently during voir dire than jurors who, in Rosenthal's view, were "pro-medical marijuana." Def.'s Br. at 26–29. According to Rosenthal, the Court accomplished this by asking "strikingly different questions" of these two classes of jurors. *Id.* at 29. This belated challenge must be viewed in the context that defendant did not object to questions on this subject and never raised an objection to any ruling the Court made with respect to the exclusion of a particular juror.

■ It is axiomatic that a criminal defendant is "not entitled to a jury of any particular composition." *Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). As such, a defendant is no more entitled to a jury that holds a particular viewpoint than one that is all

white or all Catholic. The purpose of voir dire is not to enable the parties to sculpt a jury of their liking, but rather "to ferret out prejudices in the venire that threaten the defendant's Sixth Amendment right to a fair and impartial jury." *United States v. Howell*, 231 F.3d 615, 627 (9th Cir.2000). The question, therefore, is not whether a juror harbors a particular belief or opinion, but rather whether that belief or opinion will "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 433, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). If it appears to the court that a prospective juror will not be impartial in his evaluation of the case, the juror must be removed for cause whether his partiality would tend to benefit the government or the accused. *See United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir.2000) (a juror is properly excused when his state of mind "leads to an inference that [he] will not act with entire impartiality") (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir.1997)).

Although Rosenthal asserts that no fewer than 19 prospective jurors were excluded "for expressing pro-medical marijuana beliefs," Def.'s Br. at 23–24, his motion focuses on the questions that the Court asked of prospective jurors Saunders and Molloy as representative of a more systematic bias. Saunders, whom Rosenthal classifies as "pro-medical marijuana," initially expressed concern that she "might be sympathetic to the defendant." RT 83 (Jan. 14, 2003). After explaining that sympathies were to be expected, the Court told Ms. Saunders that "[t]he question is whether or not that feeling will play any role in your determination as to whether or not the defendant is guilty or innocent." *Id.* In response, Ms. Saunders said that in light of her views regarding the federal marijuana laws, "I doubt that I could be impartial." RT 84. The Court excused Ms. Saunders sua sponte and without objection from either party. RT 197.

Prospective juror Molloy expressed a similar belief that his previous life experiences might make him "prejudiced in this case." RT 104. In response, the Court asked Mr. Molloy whether he felt that his "experience is such that [he] could not follow the law in this case." *Id.* Mr. Molloy answered that "[o]n the contrary, [he] could follow the law. Definitely." *Id.* After eliciting further comment from Mr. Molloy regarding the sources of his views, the Court explained that "[t]he question isn't whether you're opposed to [the use of marijuana] or in favor of it. The question is whether or not, notwithstanding your views, you could follow the law. The law in this case will be that it is illegal to cultivate marijuana. You feel you could follow that law?" RT 105. Mr. Molloy responded: "Yes, I do." *Id.*[3]

In Rosenthal's view, the questioning of these two prospective jurors was "strikingly different" and had the effect of empaneling a jury that was predisposed against the defendant. Def.'s Br. at 29. The proper remedy, Rosenthal claims, is a new trial.

Rosenthal's argument presupposes that there is a meaningful distinction

---

**3.** Subsequently, defense counsel asked Mr. Molloy whether he could "follow the presumption of innocence in this case, until you have heard the evidence." RT 123. Mr. Molloy answered in the affirmative. Later in the voir dire, defense counsel returned to Mr. Molloy, asking him whether he could maintain a presumption of innocence in spite of his "heartfelt attitudes and opinions." RT 157. Mr. Molloy indicated that his experiences would not preclude him from keeping an open mind until all the evidence had been presented. Mr. Molloy reaffirmed his ability to set aside his prejudices and be fair to both parties yet again in response to voir dire by the prosecution. RT 177.

between asking juror Saunders whether her preconceptions would "play any role in [her] determination," and asking juror Molloy whether "notwithstanding [his] views, [he] could follow the law." The Supreme Court has made it clear, however, that there is more than one way to question prospective jurors, *see Wainwright*, 469 U.S. at 433–34, 105 S.Ct. 844 (finding no material difference between asking jurors if their views would "interfere" with their ability to sit and asking if their views would "prevent" them from sitting), and that the trial court has broad discretion to direct the scope and manner of voir dire. *See Mu'Min v. Virginia*, 500 U.S. 415, 427, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991). Moreover, whether or not the difference in the form of the Court's questions is of legal consequence, the *responses* to those questions may require dismissal for cause. If a panel member makes a "candid admission" that he cannot be impartial, dismissal of that member is appropriate. *Howell*, 231 F.3d at 627–28 (affirming district court's dismissal of juror based on his "candid admission" that he could not judge the evidence impartially).

Here, when asked whether her sympathies toward the defendant would "play any role" in her determination of his guilt or innocence under the law, juror Saunders stated that she "doubt[ed] that she could be impartial." RT 84. By contrast, juror Molloy stated that his preconceptions would not impair his ability to judge the case on the evidence applying the law as the Court instructed. RT 104–05. Accordingly, juror Saunders was dismissed for cause and juror Molloy was not.[4] The effect of this was not to seat a jury "uncommonly opposed to Rosenthal's activities," as defendant suggests, Def.'s Br. at

29, but rather to empanel jurors whose predispositions would not "substantially impair the performance of [their] duties ... in accordance with [their] instructions and [their] oath." *Wainwright*, 469 U.S. at 433, 105 S.Ct. 844. Since a defendant is entitled to nothing more, defendant's motion for new trial will not be granted on this basis.

## IV. Jury Nullification

During closing arguments, defense counsel made the following statement to the jury:

> You have an important job in front of you. I don't understate it or underestimate it at all. It's important and a difficult task that you face, but we're confident that you're up to the task. You're well-equipped to do it, however. You're well-equipped not only because of the process you've seen unfold in front of you the last couple of weeks in the course of this trial, the witnesses that you've heard testify, the exhibits that you've seen. You're well-equipped otherwise.
>
> Nobody expects you to check your common sense at the door of the courthouse and come in with some kind of a blank slate. We can't expect you to do that. And we want you to use your life experiences to make judgments. It's unrealistic to think otherwise. You're well-equipped. Use your common sense. Use your life experiences when you judge this case.
>
> Likewise, we don't ask you to check your common sense of justice at the courthouse door when you judge this case. That would be asking far too much. And that we do not ask. We can't ask that. It's not realistic. So use your common sense. Use your common

4. Juror Molloy was later excused from the panel by means of a peremptory challenge by the defendant.

sense of justice and judge accordingly. We have to, I think, accept that as the stream of life flows along, our sense of what is just and unjust changes. And I can only hope that there are those among you and among all of us whose conception of justice...

RT 1354–55. At this point, the Court interjected as follows:

Well, ladies and gentlemen, you cannot substitute your sense of justice, whatever that means, for your duty to follow the law, whether you agree with it or not. It's not your determination whether a law is just or whether a law is unjust. That can't be your task. Go ahead, Mr. Eye.

RT 1355. Defense counsel then proceeded:

Make your judgments carefully. Make your judgments considering all the tools that you bring to bear on this task. And remember that any decision you make, any decision that you make as far as the guilt or innocence is one that's going to last a very long time. This is your one opportunity to do it and get it right. And it's a crucial opportunity. Not only judge that, but as I mentioned earlier, to send a message about what you will

expect and demand of the United States government when they prosecute cases like this. Send that message. You can do it. And you can acquit.... [W]e put our trust in your capacity to remember the evidence, and to interpret it accordingly, and to render a just result. Please do justice.

RT 1355–56.

■ Rosenthal now argues that a new trial is required because the Court's interjection improperly "interfere[d] with [the jury's] well-recognized power" to "acquit a clearly guilty defendant due to its collective conscience." Def.'s Br. at 30. In particular, Rosenthal objects to the Court's "prohibition on the jury bringing its 'sense of justice' to bear on its verdict." *Id.* While Rosenthal acknowledges that federal defendants are not entitled to an instruction concerning a jury's power to nullify, *see United States v. Powell*, 955 F.2d 1206, 1213 (9th Cir.1991), he argues that the jury may nonetheless "act[ ] as a 'safety valve' for exceptional cases." Def.'s Br. at 32 (quoting *United States v. Dougherty*, 473 F.2d 1113, 1134 (D.C.Cir.1972)). According to Rosenthal, the Court's instruction in this case "impermissibly divest[ed] the jury of [this] power." *Id.* at 33.[5]

---

**5.** Rosenthal makes a related argument in defense of the grand jury's power to "reject an indictment that, although supported by probable cause, is based on government passion, prejudice, or injustice." *United States v. Marcucci*, 299 F.3d 1156, 1164 (9th Cir.2002) (per curiam). Rosenthal contends that the prosecutor interfered with this power by telling the grand jury that Rosenthal's conduct was not protected under state law, by avoiding grand jury questions concerning the novelty of the indictment, and by falsely representing that medical-marijuana users could continue to get marijuana through cannabis clubs. This argument is meritless. The prosecutor correctly advised the grand jury that Proposition 215 does not authorize the large-scale cultivation and distribution of marijuana to others for *any* purpose, medical or otherwise. *See* Cal. Health & Safety Code § 11362.5(d) (Compassionate Use Act applies to "to a patient, or to a patient's primary caregiver, who possesses or cultivates marijuana for the personal medical purposes of the patient"). He did nothing improper by "evading" questions about the number of similar indictments sought by the government, as such questions were completely irrelevant to the grand jury's task. *See Marcucci*, 299 F.3d at 1159 (upholding constitutionality of model grand jury instruction stating that grand jury's purpose "is to determine whether there is sufficient evidence to justify a formal accusation against a person," not to "judge the wisdom of the criminal laws enacted by Congress"). Similarly, the prosecutor's statements touching upon the continued availability of medical marijuana, though false and apparently calculated to overcome grand jurors' concerns,

As an initial matter, Rosenthal's motion glosses over the distinction between a jury that "bring[s] its 'sense of justice' to bear on its verdict" and a jury whose verdict is based entirely on its "sense of justice" without regard to the Court's instructions. The Court's instruction in this case admonished the jury against "substitut[ing] its sense of justice ... for [its] duty to follow the law." RT 1355. As such, it was not, as Rosenthal suggests, an outright "prohibition on the jury bringing its 'sense of justice' to bear on its verdict." Def.'s Br. at 33. Rather, the Court instructed the jury that it could not base its decision on its "sense of justice" as a *substitute* for the law and the evidence in the case.

More importantly, Rosenthal ignores the critical distinction between the *power* to nullify and the *right* to nullify. As long ago as Bushell's Case, 124 Eng. Rep. 1006 (C.P.1670), Sir Vaughan recognized that nullification, whether proper or improper, is virtually impossible to prevent. *See* Simon Stern, Note, *Between Local Knowledge and National Politics: Debating Rationales For Jury Nullification After Bushell's Case*, 111 Yale L.J. 1815, 1817 (2002); *accord Finn v. United States*, 219 F.2d 894, 900 (9th Cir.1955) (jury's "power to fly in the teeth of the evidence and the law and acquit a defendant ... cannot be taken away from it"). More recent cases have paid heed to the jury's role as the "conscience of the community" in the context of rulings that preserve the secrecy of jury deliberations. *See, e.g., United States v. Wilson*, 629 F.2d 439, 443 (6th Cir.1980) (jury's "general veto power ... should not be attenuated by requiring the jury to ... explain its reasons"); *United States v. McCracken*, 488 F.2d 406, 419 (5th Cir.1974);

*United States v. Spock*, 416 F.2d 165, 183 (1st Cir.1969).

 The sanctity of the deliberative process, however, does not give a jury license to flout the court's instructions at will. "[T]he power of juries to 'nullify' or exercise a power of lenity is just that-a power; it is by no means a right or something that a judge should encourage or permit if it is within his authority to prevent." *United States v. Thomas*, 116 F.3d 606, 615 (2d Cir.1997); *see also Standefer v. United States*, 447 U.S. 10, 22, 100 S.Ct. 1999, 64 L.Ed.2d 689 (1980) (noting that juries can "acquit out of compassion or compromise or because of their assumption of a power *which they had no right to exercise*, but to which they were disposed through lenity") (quoting *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932)) (emphasis added); *United States v. Kerley*, 838 F.2d 932, 938 (7th Cir.1988) ("jury nullification is just a power, not also a right"); *United States v. Washington*, 705 F.2d 489, 494 (D.C.Cir. 1983) ("A jury has no more 'right' to find a 'guilty' defendant 'not guilty' than it has to find a 'not guilty' defendant 'guilty' ...."). As such, the fact that juries *have* the power to nullify does not make the *exercise* of that power inherently legitimate or proper. *See Washington*, 705 F.2d at 494 (noting that verdicts obtained through nullification "constitute an exercise of erroneously seized power").

 Indeed, the same courts that have acknowledged the jury's power to nullify have also held that "trial courts have the duty to forestall or prevent such conduct ... by firm instruction or admonition." *Thomas*, 116 F.3d at 616. Thus a court, when made aware that a juror in-

were not relevant to the issue of the sufficiency of the evidence against Rosenthal. The prosecutor's comments did not interfere with the grand jury's function to "shield individu-

als against unfounded accusations ... by requiring probable cause to indict." *Id.* at 1161.

tends to nullify, has a duty to dismiss that juror. *Id.* at 617; *United States v. Geffrard,* 87 F.3d 448, 450–52 (11th Cir.1996) (upholding dismissal of juror who presented letter to court during deliberations stating that she believed defendants were entrapped despite judge's instruction that entrapment was not an issue in the case). *A fortiori,* it cannot be contrary to law to instruct jurors before deliberations commence that they cannot decline to follow the law merely because to do so would offend their "sense of justice." *See United States v. Krzyske,* 836 F.2d 1013, 1021 (6th Cir.1988) (finding no error in district court's admonition to jury that "[t]here is no such thing as valid jury nullification .... You would violate your oath and the law if you willfully brought a verdict contrary to the law given you in this case."), *cert denied,* 488 U.S. 832, 109 S.Ct. 89, 102 L.Ed.2d 65 (1988).

▮▮▮▮ Of course, no matter how conscientiously a court may guard against the exercise of the jury's power to nullify, the court cannot divest the jury of that power altogether. "Nullification is, by definition, a violation of a juror's oath to apply the law as instructed by the court." *Thomas,* 116 F.3d at 614. As such, the power to nullify is not a power that a court can take away from the jury by means of an instruction, because it always remains within a jury's power to ignore that very instruction. Our system therefore tolerates the possibility that the jury will disregard the law in "exceptional cases" notwithstanding the court's best efforts to prevent it. *Dougherty,* 473 F.2d at 1134. Contrary to Rosenthal's suggestion, however, a court cannot make an ex ante determination of whether a case qualifies as "exceptional" and dilute its jury instructions accordingly. Rather, the court must in all cases instruct the jury to return a verdict consistent with the law; what makes a case "exceptional" is the jury's decision to disregard that instruction. The jury always retains the

power to make that decision, no matter how the court instructs it.

▮▮▮ The Court's instructions in this case were consistent with the Court's obligation to "forestall or prevent" nullification. *Thomas,* 116 F.3d at 616. The instructions did not, however, preclude the jury from bringing its sense of justice to bear on its verdict, nor did they divest the jury of its inalienable power to nullify. As such, Rosenthal is not entitled to a new trial on this basis.

## V. Juror Misconduct

Finally, Rosenthal seeks a new trial on the grounds that his Sixth Amendment rights were compromised by one juror's improper communication with an attorney-friend of hers concerning her obligation to follow the Court's instructions. Rosenthal submits that a new trial is required to remove the taint of this ex parte contact.

Rosenthal's motion is based on declarations from jurors Marney Craig and Pamela Klarkowski. Juror Craig states in her declaration that she believed that the Court's instruction not to discuss the case with anyone did not extend to a discussion "about a point of law without revealing any details about the case." Craig Decl. ¶ 4. Accordingly, Craig called a friend who is an attorney. *Id.* ¶ 5. "Without telling [the attorney] anything about the trial," Craig "asked him if [she] had to follow the Judge's instructions, or if [she] had any leeway at all for independent thought." *Id.* According to Craig's declaration, the attorney responded that she "definitely did have to following [sic] the Judge's instructions, and that there was absolutely nothing else [she] could do." *Id.* Craig then asked "if that was true, how could there ever be a hung jury"? *Id.* ¶ 6. The attorney responded that a hung jury "could only happen if the Judge gives the jury some leeway in his instructions," and then

said that Craig "could get into trouble if [she] tried to do something outside those instructions." *Id.*

Craig's declaration further states that before she contacted the attorney, she discussed her plans to do so with fellow juror Klarkowski while the two were driving home together from trial one afternoon. *Id.* ¶ 4. According to Craig, Klarkowski shared Craig's "confusion about whether [they] really had to only consider the federal law." *Id.* After Craig called the attorney, Craig "[told] Pam [Klarkowski] what [her] friend had told [her]." *Id.* ¶ 7.

Juror Klarkowski's declaration corroborates Juror Craig's description of events. In relevant part, Klarkowski's declaration states the following:

> I will attempt to recount the conversation [that I had with Juror Craig on the way home from trial] to the best of my ability. We were traveling home when Marney [Craig] stated, "I wonder if a jury really has to reach a verdict solely based on the law. I mean after all, haven't there been cases in the past where the jury has come to a decision based on their conscience. Isn't that how laws get changed?"
>
> I responded by saying that we as jurors took an oath to weigh the evidence as it is presented and to follow the law whether we agreed with it or not. I said to Marney, "However, you do bring up an interesting point. I'm sure there have been cases in the past that perhaps challenged the law but I don't really know."
>
> Marney then said she thought she would call her attorney friend and ask what his thoughts were on this matter. I asked her to let me know what she found out.

On February 1, 2003,[6] while we driving to court, I asked Marney what her friend had said. Marney responded by saying the same as we were instructed to do. We did not discuss this matter further.

Klarkowski Decl. ¶¶ 2–5.

Upon Rosenthal's motion, the Court conducted an evidentiary hearing into Rosenthal's allegations of juror misconduct on April 1, 2003. When called to testify at that hearing, juror Craig cited her Fifth Amendment privilege against self-incrimination and declined to provide oral testimony concerning the events described in her declaration. With the government's consent, the declarations of jurors Craig and Klarkowski were admitted into evidence.[7] As such, the question now before the Court is whether the contents of those declarations are sufficient to entitle Rosenthal to a new trial.

 "[A] defendant must demonstrate 'actual prejudice' resulting from an ex parte contact to receive a new trial." *United States v. Madrid,* 842 F.2d 1090, 1093 (9th Cir.1988); *see also Sea Hawk Seafoods, Inc. v. Alyeska Pipeline Service Co.,* 206 F.3d 900, 906 (9th Cir.2000); *United States v. Maree,* 934 F.2d 196, 201 (9th Cir.1991). This standard applies whenever "there was no unauthorized submission of 'extraneous information' (e.g., a file or dictionary) to the jury," but rather "ex parte contacts which did not pertain to 'any fact in controversy or any law applicable to the case.'" *Madrid,* 842 F.2d at 1093 (quoting *Rushen v. Spain,* 464 U.S. 114, 121, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983)). Since the attorney contacted by juror Craig was not asked about and did not comment upon any of the facts in the

---

**6.** The jury returned its verdict on January 31, 2003. Klarkowski testified in court that she was mistaken concerning the date of this conversation.

**7.** Only paragraphs 4 through 8 of Craig's declaration were admitted into evidence. Paragraphs 1 through 3 were excluded under Fed. R.Evid. 606(b).

case nor opine on the applicable substantive law, *see* Craig Decl. ¶ 5 (stating that Craig did not tell the attorney "anything about the trial"), Rosenthal must establish actual prejudice to receive a new trial on this ground.

The burden to establish actual prejudice in a case involving ex parte contacts rests on the moving party. *See United States v. Dutkel,* 192 F.3d 893, 896 (9th Cir.1999); *Sea Hawk,* 206 F.3d at 906. Rosenthal's argument to the contrary relies on cases involving jury *tampering.* As the Ninth Circuit has made abundantly clear, however, not every case in which a juror has an ex parte contact amounts to jury tampering. Whereas a juror's discussion of a case with friends is a relatively "prosaic kind[ ] of jury misconduct," jury tampering involves "an effort to influence the jury's verdict by threatening or offering inducements to one of more of the jurors." *Dutkel,* 192 F.3d at 895. The latter constitutes "a much more serious intrusion into the jury's processes and poses an inherently greater risk to the integrity of the verdict." *Id.* It is for this reason that prejudice is presumed in cases of jury tampering, establishing a "special rule" that does not extend to a "run-of-the-mill ex parte contact case." *Id.* at 895, 896.

Here, Rosenthal claims that juror Craig's ex parte contact prejudiced him in various ways. First, he claims, "there is the strong possibility that the extraneous legal advice communicated to Jurors Craig and Klarkowski affected their 'freedom of action as [ ] juror[s]' during deliberations." Def.'s Supp. Memo at 11 (alterations in original) (quoting *Dutkel,* 192 F.3d at 899). Rosenthal reasons that Craig and Klarkowski might have "exercise[d] their independent judgment in order to obtain a hung jury," or at least "raised the prospect of exercising independent judgment in deliberations," if Craig's friend had not ad-

vised her that "she would get into trouble if she did this." *Id.* at 11, 12–13. As evidence of this predisposition toward disobedience with the Court's instructions, Rosenthal points to the fact that Craig disobeyed the Court by contacting her friend in the first place. Rosenthal concludes that had this predisposition been acted upon, the verdict in the case might have been different. At the very least, he argues, "there is a 'reasonable possibility' that the ex parte contact 'interfered with the jury's deliberations by distracting one or more jurors, or by introducing some other extraneous factor into the deliberative process.'" *Id.* at 11 (quoting *Dutkel,* 192 F.3d at 897).

To establish actual prejudice, however, Rosenthal must show more than a *possibility* that the ex parte contact affected a juror's deliberations. *See Sea Hawk,* 206 F.3d at 906. The evidence before the Court falls well short of this standard. Significantly, neither juror Craig nor juror Klarkowski states in her declaration that she would have voted differently had it not been for Craig's ex parte contact. To the contrary, juror Craig states that she was "determined to abide by the Judge's instructions," Craig Decl. ¶ 4, while juror Klarkowski recounts her understanding that she and Craig had taken "an oath to weigh the evidence as it [was] presented and to follow the law whether [they] agreed with it or not." Klarkowski Decl. ¶ 3. Rosenthal's rank speculation that either juror *might* have nullified the law had Craig's friend not warned against it, or that she *might* have raised the idea of nullification during deliberations, is insufficient to establish actual prejudice.

Even if Rosenthal were able to show that one or more jurors would have voted differently but for the ex parte contact, the "prejudice" resulting from the contact would be, in effect, interference with a

juror's predisposition to nullify. In other words, Rosenthal's argument would be that a new trial is warranted because Craig's friend's exhortations to follow the law interfered with Craig's inclination to disobey it.[8] This novel proposition is fundamentally irreconcilable with the Court's responsibility "to forestall or prevent" nullification whenever it is possible to do so. *Thomas*, 116 F.3d at 616. Rosenthal has failed to identify a single published decision in support of this argument, and this Court will not be the first to write one.

Rosenthal also contends that the fact that jurors Craig and Klarkowski kept Craig's ex parte contacts secret from other jurors suggests that they were "hesitant about engaging in the normal give and take of deliberations." Def.'s Supp. Memo at 12 (quoting *Dutkel*, 192 F.3d at 898). Once again, the mere possibility that a juror might have hesitated to engage openly in deliberations falls well short of demonstrating actual prejudice to the defendant. In any event, the jurors' secrecy about Craig's ex parte communication has virtually no probative value with respect to the manner or extent of their participation in the jury's deliberations. Moreover, to the extent that Craig and Klarkowski did take pains to conceal the contact, this would tend to minimize rather than augment the attendant risk of prejudice.

Finally, Rosenthal points to the existence of evidence that jurors Craig and Klarkowski were anxious, troubled, and confused. The evidence to which Rosenthal alludes, however, is a paragraph of Craig's declaration that has not been admitted into evidence. Furthermore, *Dutkel*, upon which Rosenthal relies for the proposition that a juror's anxiety might impair her ability to deliberate effectively, was a case of jury tampering. There, the court expressed concern over evidence that a juror was, as a result of the tampering, "disturbed and troubled ... *about his own and his family's safety*." *Dutkel*, 192 F.3d at 898 (emphasis added). As the court noted, this form of anxiety is readily distinguishable from any anxiety that might be associated with a run-of-the-mill ex parte contact. *See id.* at 895. Here, the record is completely devoid of evidence pointing toward the former variety of stress, and Rosenthal has supplied no authority for the notion that generalized anxiety of the latter sort may materially impair a juror's effective deliberation.

For these reasons, Rosenthal has failed to carry his burden of demonstrating actual prejudice as a result of juror Craig's ex parte communication. The communication between juror Craig and the attorney concerning Craig's duty to obey the Court's instructions does not warrant a new trial.

### CONCLUSION

For the reasons stated above, Rosenthal has failed to establish that he is entitled to a new trial. Accordingly, Rosenthal's motion is hereby DENIED.

**IT IS SO ORDERED.**

---

**8.** In a variation of this argument, Rosenthal suggests that Craig's friend's statement that Craig could get in "trouble" for failing to follow the Court's orders was unduly coercive. In support of this contention, Rosenthal cites a number of cases in which convictions were reversed because the *court* issued coercive instructions to the jury. *See* Def.'s Supp. Memo at 13–14. These cases are plainly distinguishable.